**SEATTLE–FIRST NATIONAL BANK, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SEATTLE–FIRST NATIONAL BANK, Respondent.**

**Nos. 88–7416, 88–7547.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 31, 1989.

Decided Dec. 20, 1989.

As Amended Jan. 26, 1990.

Mark A. Hutcheson, Davis, Wright and Jones, Seattle, Wash., for petitioner/respondent.

Linda Dreeben, Supervisory Atty., N.L.R.B., Washington, D.C., for respondent/petitioner.

Edward P. Wendel, Asst. Gen. Counsel, United Food & Commercial Workers Intern. Union, Washington, D.C., for intervenor.

Before BROWNING, SCHROEDER and FLETCHER, Circuit Judges.

FLETCHER, Circuit Judge:

I

Seattle–First National Bank ("SeaFirst") petitions from a National Labor Relations Board ("NLRB" or "Board") decision finding it in violation of the National Labor Relations Act and ordering it to bargain. The Board cross-petitions for enforcement of its order. We deny SeaFirst's petition and enforce the Board's order to bargain.

II

BACKGROUND FACTS AND PRIOR PROCEEDINGS

In 1970 SeaFirst's employees chose the FirstBank Independent Employees Association ("the Independent") as their bargaining representative in a Board-conducted election. The Board certified the Independent; the Bank and the Independent entered into a collective bargaining agreement in 1971, which lasted until October, 1977. By the end of 1977, negotiations for

a new contract were proving long and difficult, and the executive council of the Independent considered affiliation with an international union to strengthen its bargaining position.

In January, 1978, the Independent's executive council notified employees that it would submit to union members for a vote a proposal to affiliate with the Retail Clerks International Union ("the International"). The bargaining unit consisted of over 4700 employees, of whom approximately 55% were members of the Independent. Nonmembers were not permitted to vote. The election took place in February, and a little more than 60% of the members who voted approved the affiliation.

On April 1, 1978 the Independent received a charter from the International and became the Financial Institution Employees of America, Local 1182, chartered by Retail Clerks International Union, AFL–CIO ("FIEA"). On June 19, FIEA petitioned the Board to amend its certification to reflect its new name. SeaFirst notified the Board that it opposed the certification because the election violated due process by excluding nonmembers and because the affiliation broke the continuity of representation required.

The Board's Region 19 conducted a two-day hearing in July of 1978 to consider the fairness of the affiliation election and the extent to which the affiliation disturbed the continuity of representation. This was the only proceeding in which evidence was taken; in practically every proceeding since, SeaFirst has attempted to introduce new evidence.

On April 5, 1979, the Board granted the amendment to the union's certification. *Seattle–First Nat'l Bank*, 241 N.L.R.B. 751.

SeaFirst nonetheless refused to recognize and bargain with FIEA. The case went to the Board again, this time for a determination of whether SeaFirst, in refusing to bargain, was in violation of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), 158(a)(5). In September of 1979, the Board, resting on its prior findings in the certification case, concluded in a summary judgment proceeding that SeaFirst was in violation of the Act and ordered it to bargain. 245 N.L.R.B. 700. The Board rejected SeaFirst's request to reopen the hearing and to take evidence related to allegations made in the affidavit of James A. Versoi, Manager of Labor Relations at SeaFirst. The affidavit alleged among other things that there was a 100% turnover of union officers, that the new union was attempting to organize other employers' workers, and that many employees were leaving the union because they thought that the affiliation election was not fair and right.

SeaFirst petitioned this court to review the Board's bargaining order. While review was pending, the Board requested leave to reconsider its decision in light of the Fifth Circuit's opinion in *Amoco Prod. Co. v. NLRB*, 613 F.2d 107 (5th Cir.1980). The petition to this court was withdrawn. The *Amoco* case held that nonunion members must be allowed to participate in an affiliation election in order for a union to maintain its status as a certified representative. The Board decided to follow the Fifth Circuit opinion, vacated its previous decision in favor of the union, and issued a new decision in which it addressed only the election issue and not the continuity issue.

FIEA petitioned this court for review. We reversed the Board's decision. *NLRB v. Financial Institution Employees, Local 1182*, 752 F.2d 356 (9th Cir.1984). The Supreme Court granted certiorari and affirmed the Ninth Circuit in a unanimous opinion. *NLRB v. Financial Institution Employees, Local 1182*, 475 U.S. 192, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986). Both the Ninth Circuit and the Supreme Court decided only the election issue, because that was the only issue the Board addressed after it had vacated its initial decision. We remanded the case to the Board in 1986 for a determination of the continuity issue. 788 F.2d 1411.

On July 29, 1988, on the basis of the July, 1978 hearing the Board decided the continuity issue in favor of FIEA and found SeaFirst in violation of §§ 8(a)(1) and 8(a)(5) of the Act. 290 N.L.R.B. No. 72

(slip op.). We now review that decision. In addition, SeaFirst has filed a motion with this court to supplement the record so that the court can consider whether FIEA's 1988 merger with another local of the United Food and Commercial Workers International [1] raises a question of representation.

## III

### DISCUSSION

A. Supplementing the Record.

Before we consider the merits of the Board's decision, there are two preliminary matters we must consider, both of which concern the scope of the record under review.

#### 1. *The 1988 Merger*

■ SeaFirst asks this court to consider, or alternatively, to remand to the Board to consider, continuity of representation in light of FIEA's 1988 merger with another local. It submits materials setting forth the terms of the merger and the UFCW International constitution. In light of the merger, SeaFirst contends the Board's bargaining order is inappropriate even if the court affirms the Board's finding of § 8(a)(1) and § 8(a)(5) violations.

SeaFirst offers several theories that would enable this court to take cognizance of the new information and rule on the "new" continuity issue. Its first theory is that the papers are judicially noticeable because they were filed with a public agency. The second is that Rule 10(e) [2] of the Federal Rules of Appellate Procedure, and the inherent equitable powers of courts generally, allow this court in its discretion to expand the record on appeal. The third is that the United States Supreme Court held in *NLRB v. Jones & Laughlin Steel Corp.*, 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947), that courts reviewing bargaining orders may take cognizance of evidence unobtainable at the time the case was be-

fore the Board and may either rule on the case in light of the new evidence or remand the case to the Board for further consideration.

Only the third of these theories merits any discussion. The first two, though flawed for a number of reasons independent of *stare decisis*, run headlong into a wall of Ninth Circuit cases that prohibit our consideration of the supplemental evidence. See *L'Eggs Prods., Inc. v. NLRB*, 619 F.2d 1337 (9th Cir.1980); *NLRB v. Coca–Cola Bottling Co.*, 472 F.2d 140 (9th Cir.1972); *NLRB v. L.B. Foster Co.*, 418 F.2d 1 (9th Cir.1969). In *L'Eggs* the court held that in enforcement cases it will neither consider on its own, nor remand to the Board for the Board's consideration, evidence demonstrating that because of the passage of time, the union may not be as representative of the employees in the relevant unit as it was when the employer first refused to bargain. 619 F.2d at 1353. The court in *L'Eggs* noted that a contrary practice would put a premium on continued litigation by the employer. *Id.* As support for its decision the court cited *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944), which held that the fact that a union has lost its majority status at the time a bargaining order is issued does not preclude enforcement of the order. The very specific policy of deterring protracted litigation advanced by *Foster* and *L'Eggs* necessarily trumps the vague equitable concerns that SeaFirst cites as reasons for this court to take judicial notice of the evidence or to take extraordinary action under its "inherent authority."

The third theory, relying on *Jones & Laughlin*, would permit reviewing courts either to consider the new evidence themselves or to remand to the Board.

In *Jones & Laughlin*, the employer refused to negotiate with a unit of plant guards because the guards had been sworn in as auxiliary police of the United States

---

**1.** The Retail Clerks International Union merged with another union in 1979 to become the UFCW. The Board amended the certification of the RCIU; the propriety of that decision is not questioned.

**2.** If any Rule would govern it would be Rule 16(b), not 10(e). Rule 10 applies only to records made in the district court.

Army during World War II, a fact which, in the view of the employer, made it particularly inappropriate to allow them to unionize. The Board disagreed and ordered bargaining. The Sixth Circuit refused to enforce the Board's order. The Supreme Court granted certiorari, vacated the Sixth Circuit's opinion on the grounds that militarization of guards did not preclude their unionization, and asked the circuit court to consider the employer's other arguments against enforcing the Board order. By the time the Sixth Circuit reconsidered the case, the guards had been demilitarized but they had been sworn in by the city of Cleveland as deputy police officers. The Sixth Circuit considered this factor—even though it was not before the Board—and again refused to enforce the Board's order, this time on the grounds that deputization was inconsistent with unionization.

The Supreme Court granted certiorari again, and even though it ruled for the Board on the merits, it rejected the Board's argument that because the deputization issue had never been presented to the Board, it was improper for the Sixth Circuit to have considered it:

> When circumstances do arise after the Board's order has been issued which may affect the propriety of enforcement of the order, the reviewing court has discretion to decide the matter itself or to remand it to the Board for further consideration. For example, where the order obviously has become moot, the court can deny enforcement without further ado; but where the matter is one involving complicated or disputed facts or questions of statutory policy, a remand to the Board is ordinarily in order.

331 U.S. at 428, 67 S.Ct. at 1281. The Supreme Court found its position to be consistent with § 10(e) of the NLRA, 29 U.S.C. § 160(e):

> [T]he provision of § 10(e), that "No objection that has not been urged before the Board, its member, agent or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances," quite obviously refers to objections that might have been

but were not raised in the original proceedings before the Board.

331 U.S. at 427, 67 S.Ct. at 1281.

An objection to an order to bargain based on the union's alleged loss of majority support in the period after the time of the Board's order might, on a superficial reading of *Jones & Laughlin*, seem to be the type of objection outside § 10(e)'s limitation that an appeals court should consider in an enforcement proceeding. But a long line of cases, from *Franks Bros.* to *L'Eggs*, stands for the proposition that the purpose of an order to bargain is not simply to effectuate majority rule in a particular case but also to deter wrongful refusals by employers to recognize majorities promptly. Nothing in *Jones & Laughlin* dictates a departure from that policy.

In *Jones & Laughlin*, the employer was not asserting that changed circumstances raised a question of representation or of the union's majority status; it was raising a broader objection to bargaining—namely that the status of unit employees as police officers was inconsistent with the policies of the Act. In the class of cases in which the passage of time is not inherently likely to make the employer's basis for objection to bargaining appear more and more "reasonable," the reasons for a court to refuse pleas of changed circumstances are less compelling than where delay feeds upon itself and makes unreasonable positions seem continually more "reasonable." With each passing year any union's constitution, in both senses of the word, is likely to change. When lack of a union majority, or as in this case, lack of continuity, is the asserted basis for a refusal to bargain, delay becomes the basis of an argument that there ought to be more delay. To paraphrase what this court said in *Foster*, "When will it stop?" We stop it here. We decline to expand the record before this court or to remand.

#### 2. *The 1979 Versoi Affidavit*

■ SeaFirst has repeatedly asked the Board to hold a new hearing in light of "new evidence" presented in the June 29,

1979 affidavit of its Manager of Labor Relations, James A. Versoi.

The Board refused to grant a new hearing, citing its rule that newly discovered evidence is only grounds for a new hearing if the evidence was in existence at the time of the original hearing and the party excusably failed to adduce it. 29 CFR § 102.48(d)(1). In *NLRB v. Cutter Dodge, Inc.*, 825 F.2d 1375, 1381 (9th Cir.1987), this court explicitly stated that the application of this rule to deny a new hearing was not an abuse of the Board's discretion. There is thus no merit in SeaFirst's contention that the Board was required to consider the Versoi affidavit.

SeaFirst argues that setting a hearing four months after an affiliation does not allow the challenging party enough time to prove that changes have occurred, since a "devious" International could present a facade for that long. There are two problems with this argument. First, it proves too much; a devious union might be able to put up a front for even longer. How long is the Board to wait? The hearing on the amendment to certification was the most expeditious and efficient proceeding in the twelve-year saga of this litigation. We hesitate to fault the Board for expedition. Second, even if the "facade" argument might have merit in some cases, this is not such a case. The July, 1978 hearing offered ample opportunity to SeaFirst to make its case on the issue of continuity. SeaFirst made no effort to develop a record, through either its own or FIEA's witnesses, on the future changes expected in the relationship among the International, the union, and its members. The hearing officer put no obstacles in the way of SeaFirst's lawyer. Any paucity in the record inheres in the facts themselves, or in SeaFirst's failure to elicit them.

SeaFirst's motion to supplement the record to include the Versoi affidavit is denied. The Board did not err in deciding the case on the record made at the 1978 hearing.

**B. Continuity.**

■ Under 29 CFR §§ 101.17 and 102.-60(a), a certified union that has elected to affiliate with another union may petition the Board for an amendment to its certification to reflect its new name. The Board holds a hearing and grants the amended certification unless a "question of representation" exists. A "question of representation" is defined as sufficient doubt about the union's continuing status as the legitimate representative of employees in a particular unit that a new election should be conducted to determine employee sentiment. *See* National Labor Relations Act § 9(c), 29 U.S.C. § 159(c). If a "question of representation" exists, the Board refuses to amend the union's certification, and, pending a new election, the employer is relieved of the duty to bargain. *See FIEA*, 475 U.S. 192, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986).[3]

Whether a question of representation exists is a question of fact. We defer to the Board if there is substantial evidence in the record as a whole supporting the Board's finding. *Retail Store Employees Union, Local 428 v. NLRB*, 528 F.2d 1225, 1227 (9th Cir.1975). We also defer to the Board's substantial expertise in interpreting and applying the National Labor Relations Act, unless its interpretation is inconsistent with the policies of the Act. *Mesa Verde Constr. Co. v. Northern California in Dist. Council of Laborers*, 861 F.2d 1124, 1130 (9th Cir.1988) (en banc).

The Supreme Court's decision in its earlier review in this case informs our current review of the Board's decision. The Court discussed in some detail the contours of continuity in affiliations in the course of deciding the issue of whether unions must allow nonmembers to participate in affiliation elections. *See NLRB v. FIEA*, 475 U.S. at 199–200, 106 S.Ct. at 1011–12.

---

**3.** The Board's practice is to grant an amendment to certification after an election to affiliate if the election is conducted in accordance with due process and if the affiliation does not cause changes sufficiently dramatic to break the continuity of representation provided by the old union. *See Western Commercial Transport*, 288 N.L.R.B. No. 27, 1987–88 NLRB Dec. (CCH) ¶ 19,309 (Mar. 25, 1988). Only the continuity issue concerns us here.

The Court noted the several purposes of affiliation, strongly suggesting that certain changes inhere in affiliation and should not be accorded significant weight in deciding the question of continuity.

The Court noted that a local union may seek to affiliate with a larger organization for a variety of reasons, such as to obtain "bargaining expertise or financial support or [to] compensate for a lack of leadership within the local union." 475 U.S. at 199 n. 5, 106 S.Ct. at 1011 n. 5. It quoted approvingly from a decision of the NLRB that a union "must remain largely unfettered in its organizational quest for financial stability and aid in the negotiation process," *id.*, and from the Board's brief that the "Board has in general found that affiliations do not destroy continuity of representation." *Id.* at 203 n. 10, 106 S.Ct. at 1013 n. 10.

These comments were essentially consistent with the approach taken by the Board over the years in deciding continuity questions. A new label to identify a change that would defeat continuity, "sufficiently dramatic," emerged, *id.* at 206, 106 S.Ct. at 1015, but it was just that—a new label. The Court's discussion of continuity constituted a blessing of the Board's basic approach.

In contrast, the Court's statements cast doubt on the continuing validity of the Third Circuit's jurisprudence in this area, on which SeaFirst heavily relies. In *Sun Oil Co. v. NLRB*, 576 F.2d 553, 556 (3rd Cir.1978), the Third Circuit, quoting from a previous decision in which it found an affiliation to raise a question of representation, *American Bridge Div., U.S. Steel Corp. v. NLRB*, 457 F.2d 660, 664 (3rd Cir.1972), stated, "The very act of affiliation here is a commitment to change in the fulcrum of union control and representation." Citing another of its decisions, *NLRB v. Gloekler N.E. Co.*, 540 F.2d 197 (3rd Cir.1976), the *Sun Oil* court also held that an increase in economic power wrought by affiliation is of "particular significance" to the continuity question. *Sun Oil*, 576 F.2d at 557. The court also found the size of the international union, 200,000 members, to be significant. *Id.* These factors shrink in signifi-

cance if one takes seriously the Supreme Court's view that increased size, financial support, and bargaining power are the very reasons why independent unions join internationals. The very ordinariness of such factors strongly suggests that something more must change before an affiliation raises a question concerning representation.

*Western Commercial Transport*, 288 N.L.R.B. No. 27, 1987–88 NLRB Dec. (CCH) ¶ 19,309 (1988), decided by the Board shortly after the Supreme Court's *FIEA* decision, suggests the content of that "something more." In that case, a small, independent union of 45 members had governed itself according to the following rules: officers were nominated by petition of 25 members and were elected by majority vote; proposals to amend the constitution and bylaws had to be made by 25 members, and they could be enacted with a majority vote; executive council policy decisions were subject to referendum; and an executive committee chosen from among the executive board was to represent the Union in contract negotiations. This intimate collective, strapped for funds, joined a District Lodge of the International Association of Machinists.

Upon affiliating with the IAM, the independent did not become a self-contained local of the IAM. Rather, it became part of a district lodge of 8500 members. The smallest subdivisions within that lodge were locals of approximately 500 members. No group of fewer than 500 members could choose its own delegate. There were 136 employees in the bargaining unit that the old independent union represented, so the members of the old unit were effectively voiceless in the new organization. Even the one delegate that the local of 500 could pick was not a true representative. Rather, he or she merely was one of 17 people who voted for full-time, professional agents to manage day-to-day representation matters. The old union's officers had to give up their positions. Day-to-day contract administration was in the hands of staff members with no ties to the independent's

bargaining unit. On these facts, the Board found that continuity did not exist.[4]

*NLRB v. Insulfab Plastics, Inc.*, 789 F.2d 961 (1st Cir.1986), is illustrative of cases where the Board did *not* find the "something more." The First Circuit affirmed the Board's finding of continuity, holding that an affiliation of a small independent union with a large international fulfilled the requirement of continuity even though the independent became subject to the international's constitution. That constitution established minimum dues and placed limits on the union's constitution. The court in *Insulfab* noted that the union continued to retain control over negotiating and administering contracts, processing grievances, and calling strikes. 789 F.2d at 966–67.

It is tempting to find a guiding principle to the effect that if an independent becomes a self-contained local by affiliation with an international, continuity is preserved, but if an independent merges into a pre-existing local of an international, continuity is defeated. *Compare Insulfab with Retail Store Employees*, 528 F.2d 1225 (9th Cir.1975).

But to ask only whether the old independent has become its own local oversimplifies the analysis. The Board considers several factors that bear on the question of continuity. The ultimate question is whether the union after affiliation operates in substantially the same way as it did before affiliation. The Board's expertise in the day-to-day functioning of labor organizations particularly suits it to determine the factors that bear on this question and the weight to be accorded them in particular cases. In this case the Board considered several factors: (1) whether the members and leaders of the union continue to exercise a similar degree of participation and control in decisions such as approving contracts and strikes, (2) whether the structure of the prior union's government remains substantially intact, (3) whether

funds remain under the control of similar officers, (4) whether dues are collected in the same way, (5) whether jurisdictional provisions remain the same, (6) whether the prior union's policy-making body retains similar responsibilities, (7) whether leaders are elected from similar-sized units of workers, and (8) whether grievances are handled in a similar manner. The Board's determination that these factors are relevant is consistent with the policy of § 9 of the National Labor Relations Act to promote stability in collective bargaining relationships. *See FIEA*, 475 U.S. at 208–09, 106 S.Ct. at 1016–17. We therefore defer to the Board's determination.

The task remains for us to decide whether the conclusion the Board reached after applying those factors is supported by substantial evidence in the record. Understandably, the parties stress those facts and approaches to the evidence that advance their arguments.

SeaFirst argues that the inquiry should focus on the differences in the precise letter of the two constitutions, the Independent's and the International's. The union, by contrast, argues that the focus should be on how the union has functioned in practice under each constitution. The Board agreed with the union that the controlling considerations were the practices under the constitution; it credited the testimony of Mr. Donald J. Hofer, International Vice–President and Director of the Northwest Division of the Union, who explained how the International constitution had operated in practice during his twenty years' experience working with the document and concluded that local control remained essentially intact. We do not find error in the Board's view that the practices were controlling.

Against this backdrop, we consider the Board's application of the factors it found relevant. With regard to the first factor, the processes for approving strikes and contracts, several provisions of the Interna-

---

**4.** Because we hold that there is substantial evidence to support the Board's finding of continuity, we need not address the additional issue faced by the Board in *Western Commercial* whether, absent continuity, a petition to amend certification should still be granted when a majority of employees in a unit vote to affiliate.

tional constitution that potentially reallocate power are pertinent. Section 8(B) of the constitution reads:

> The International Executive Board shall have power to authorize strikes ... when necessary to defend the organization in any locality against the attacks of employers, combinations [or] lockouts[;] to support such actions by levying a per capita tax assessment *and by ordering a cessation of work for any employer involved, irrespective of where such work is located.*

The underscored clause is particularly controversial, because the International's power to *order* a strike would seem to present a considerable change in the relationship between unit employees and their bargaining representative. Under the union's pre-affiliation constitution, 60% of the members and two-thirds of the executive committee had to vote in favor of a strike before it could be ordered. But the record before the Board did not include just a bare document. Mr. Hofer testified about the clause:

> [I]n the twenty years that I've been an employee or an elected official of the union, I've never seen it used, and I've served on the International executive board for three years ... [W]e can't— the International executive board can't— we can authorize a strike but we sure can't call one. The local union has to vote to strike.

On the issue of whether the International could prevent a local from striking when the local voted to do so, the language is ambiguous. Hofer testified that the practice had been that a local could strike without authorization, and the only sanction would be that it would not receive strike benefits from the International. Since the Independent did not provide strike benefits, the procedure for approval of strikes before and after affiliation is quite similar. Before affiliation, the Independent could strike after a two-thirds' vote of its executive council and a three-fifths' vote of the

affected employees. Under the International constitution, a majority vote of the local executive council and a two-thirds' vote of the affected employees allows the local to strike.

Section 9(K) of the International's constitution, which gives the International power to place a local in trusteeship, effectively depriving it of all autonomy, came under particular scrutiny. Mr. Hofer testified that the power was not a significant threat to the great majority of locals, that in the five years prior to the hearing, trusteeships had been imposed on four out of a total of 215 locals—three for financial misdeeds and one by request from a local union torn by in-fighting.[5]

Section 32(D)(2) of the International constitution provides that if the President of the International so requests, a membership-approved collective bargaining agreement must be submitted to him for approval before it is finally ratified. However, Hofer testified that in his experience the clause had never been used and that the members of locals for all intents and purposes had the last word on the terms of collective bargaining agreements.

Section 32(D)(7) of the International constitution sets out contract and strike procedures different from the old procedures. It provides that in the event the employees both reject the employer's final offer and refuse to strike, the executive committee of the local can make a decision whether or not to accept the contract. Under the previous constitution, the employees' rejection of the contract was final. The difference is not crucial, however, because power remains vested entirely in local committees. The International has no say in the matter.

The controversy over the second factor, the continuity of officers, centers on a factual dispute. Immediately after FIEA received its charter from the International, the officers were the same persons. In the period between the time of the charter and the time of the hearing, April 1 to July 26,

**5.** In its brief SeaFirst cites several news accounts and judicial findings of exercises of the International's power in order to show that, contrary to Hofer's testimony, the International's power is not merely theoretical. The examples all are from the 1980's. For reasons stated in section III.A. of this opinion, we do not consider this evidence.

two of the three constitutional officers (President, Treasurer, and Secretary) quit, but there was no evidence that the turnover was a product of orders from the International or even subtle pressure. *Cf. Western Commercial Transport* (incumbent officers were not permitted to retain their positions). The resigning officers were replaced in accordance with the rules established by the Independent before affiliation. The functions of the constitutional officers remain the same after affiliation, although the titles have been changed to President, Secretary–Treasurer, and Recorder. The Secretary–Treasurer has the same responsibilities as the old Treasurer, and the Recorder's job corresponds to the old Secretary's. Under these circumstances, the change in officers is not inconsistent with the Board's finding of continuity.

Prior to the affiliation, the union's assets were in a checking account, withdrawals from which were restricted to persons holding certain offices. The same restrictions have applied since affiliation, and no International officer has any access to FIEA's funds. Thus evidence bearing on the third factor also supports the finding of continuity. *See Insulfab.*

After affiliation, the constitutional provisions respecting membership dues changed. The International required locals to charge at least six dollars per month, while the Independent had charged four dollars. The effect of the change was mitigated by the International's agreeing to waive the increase for at least one year. More importantly the local has the right, after affiliation, to charge higher dues than the International. The International constitution does give the International the power to levy a tax on the local, and the local, not the individual members, pays the tax. However, the international union often agrees to "subsidize" the local by waiving the tax, which it promised to do in this case, at least until FIEA became financially stronger. We note that there is at least as much autonomy reserved to the local to determine dues in this case as there was in *Insulfab.*

With regard to the fifth factor, jurisdiction, the Independent's constitution expressed some ambivalence. It cited employment at SeaFirst as a membership qualification, but also specifically mentioned that action of the executive council and ratification by the employees of amendments to the constitution could alter that requirement. The Independent's president testified that the reason the union never sought to organize other employers was lack of resources, not lack of support among members for such activities.

With regard to the three remaining factors, there was substantial evidence that FIEA's executive council was an analog of the Independent's executive council, exercised the same functions, and had similar powers. It was also clear that leaders were to be elected from the same unit as before the affiliation. The previous two factors distinguish this case from *Western Commercial* and from the cases where the independent, rather than becoming its own local, is swallowed up by another local. *Cf. Retail Store Employees.* Finally, there was evidence that grievances and other day-to-day affairs after affiliation were handled according to procedures similar to those used before affiliation.

In sum, although the affiliation brought changes, there is substantial evidence in the record as a whole to support the Board's determination that the new union retained enough of its old character to render those changes insufficiently dramatic to warrant a finding that there could be a question of representation. We accord substantial deference both to the Board's choice of relevant factors and to the weights the Board assigns those factors. In this case there is no reason to upset the Board's calculus.

We reject SeaFirst's last argument that the Board should have considered evidence regarding employee support for affiliation as a factor in determining continuity. Specifically, the bank argues that the fact that "only" 61% of union members voted in favor of the affiliation in this case is evidence of a lack of continuity. SeaFirst is essentially trying to fight the same battle that it

lost in the Supreme Court. In *FIEA*, 475 U.S. at 206, 106 S.Ct. at 1015, the Court held that affiliation is an internal union affair so long as continuity is maintained. A one-vote margin is enough.[6]

The flaw in SeaFirst's reasoning is that it assumes an employee's vote for affiliation is evidence of his or her feeling that the new union will be substantially the same as the old. There is simply no basis for attributing that motive to a vote. A worker may vote for affiliation hoping that things will change radically or vote against affiliation believing that affiliation won't make enough difference in the way things are run.

### IV

### CONCLUSION

The Supreme Court has stated that the central policy of the National Labor Relations Act is to promote industrial stability and that allowing employers to respond to ordinary affiliations by refusing to bargain with a duly elected union would undermine that policy. *See FIEA*, 475 U.S. at 208–09, 106 S.Ct. at 1016–17. The criteria that the Board applied in this case were fully consistent with the central policy of the Act. Substantial evidence in the record as a whole supports its findings that the criteria for continuity were met.

We DENY SeaFirst's petition and ENFORCE the Board's order.

6. We do not imply that *absent* continuity, the expressed will of all employees, union and non-union, is irrelevant to whether there is a question of representation. See n. 4, *supra*.