**MAY DEPARTMENT STORES COMPANY, VENTURE STORES DIVISION,** Petitioner, Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,** Cross–Petitioner.

United Food and Commercial Workers Union, Local 881, Chartered by United Food and Commercial Workers International Union, AFL–CIO, CLC, Intervenor.

Nos. 88–3302, 89–1065.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 24, 1989.

Decided Feb. 28, 1990.

Reconsideration En Banc Denied April 11, 1990.

Jairus M. Gilden, Neal D. Rosenfeld, Rosenfeld & Karmel, Chicago, Ill., John W. Noble, Jr. (argued), Alex V. Barbour, Pope, Ballard, Shepard & Fowle, Chicago, Ill., for petitioner.

Aileen A. Armstrong, Laurence Zakson, Howard E. Perlstein, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., Donald J. Crawford, N.L.R.B., Chicago, Ill., Edward P. Wendel, Washington, D.C., for respondent.

Jairus M. Gilden, Rosenfeld & Karmel, Chicago, Ill., for intervenor.

Before BAUER, Chief Judge, and WOOD and COFFEY, Circuit Judges.

BAUER, Chief Judge.

Like an old friend—or a bad cold—this case just seems to keep coming back. After a laborious history that has included two previous trips to this court, this 1981 unfair labor practices claim against May Department Stores Company, Venture Stores Division ("Venture") has reached us again. In the instant matter, Venture petitions for review of an order of the National Labor Relations Board ("NLRB" or "Board"), reported at 289 NLRB No. 88 (June 30, 1988) (*"Board Decision"*), in which the Board found that Venture violated Sections 8(a)(5) and (1) of the Labor–Management Relations Act ("Act"), 29

U.S.C. §§ 158(a)(5) and (1), by refusing to recognize and bargain with the United Retail Workers Union, Local 881 ("Local 881"). The NLRB has responded with a cross-application for enforcement of this order, and Local 881 has intervened. In what we hope is our final visit from this case, we deny Venture's petition and grant the Board's cross-petition for enforcement, for the reasons discussed below.

## I.

The facts of this dispute, to which the parties stipulated long ago, have been set forth in detail in the NLRB decision at issue. *Board Decision* at 3–10. For our purposes here, a brief summary of the relevant highlights will suffice.

The dispute centers on the merger/affiliation [1] of two unions: the United Retail Workers Union ("URW"), and the United Food and Commercial Workers International Union ("UFCW"). Prior to the merger, the URW was an independent union with four locals and about 20,500 members, including 1,214 members employed by Venture. The UFCW was and is an international union affiliated with the AFL–CIO.

In the summer of 1981, the officers of the URW unanimously endorsed a "resolution of merger" between their union and the UFCW. A mail ballot referendum was then called for in which the rank and file members of the URW would be asked to approve the proposed merger. Before the balloting, all URW members received, among other things, a copy of the merger agreement and UFCW's constitution. URW and UFCW officers conducted, after duly notifying all URW members, a num-

ber of special information meetings regarding the merger. The URW set up a telephone "hot line" to answer members' questions about the merger. In addition, URW and UFCW officers sent explanatory information to all employers with employees represented by the URW ("covered employers"), including Venture.

On July 31, a direct mail service hired by URW mailed secret ballots, return envelopes and instructions to all individuals eligible to vote on the merger. [2] All ballots were to be returned to LaSalle Bank, which had been appointed to receive and tally the ballots, by the close of business on August 20. On August 21, LaSalle Bank opened and tabulated the ballots. It reported that 6,823, or approximately 74 percent, of the ballots validly cast [3] were cast in favor of the merger, with 2,344, or about 26 percent, against. It was also determined that, of the 1,214 Venture employees who were sent ballots, 389 sent them in. However, because all the ballots were commingled for counting purposes, it was and is impossible to determine how these 389 employees —or, indeed, how the employees of any single bargaining unit—voted.

Under the terms of the merger agreement as approved in the referendum, the whole of the URW became Local 881, "an autonomous local union chartered by the UFCW," with the URW's former four locals redesignated as "administrative districts" of Local 881. Local 881 retained all URW property and assets, including the URW treasury. The agreement provided that Local 881 would be governed by both the UFCW constitution and its own set of by-laws, with any conflicts being resolved in favor of the by-laws, at least for the

---

**1.** "Merger/affiliation" is used because the unions used both terms at various times to describe their agreement. The arrangement in this case is probably most accurately termed a "merger," thus we will hereinafter use that term. The label chosen matters little, however; as we noted in our second opinion in this case, the considerations relevant to assessing a merger and an affiliation are the same, at least for the purpose of the issues in this case. *United Retail Workers Union, Local 881 v. NLRB,* 797 F.2d 421, 423 (7th Cir.1986).

**2.** To be included in the pool of eligible voters, an individual had to be either an active URW member employed by a covered employer as of the last payroll date prior to July 31, 1981, or a nonmember employed by a covered employer as of the last payroll date prior to July 31, 1981, who had not completed but would complete his/her 30–day probationary period before July 31, and from whom the URW had received a membership application before July 31.

**3.** According to the bank's tally, 68 ballots were "invalid." In addition, 119 ballots were returned as undeliverable.

first three years. Local 881 would be directed by three officers, a general executive board composed of these officers and twenty-two vice-presidents, and an executive council composed of the three officers and eight of the twenty-two vice-presidents. The merger agreement provided that, for the first three-year term, these positions would be filled entirely by former officers of the URW. Specifically, the former National Executive Director of the URW would become the President of Local 881; URW's National Vice President/Treasurer would become Local 881's Secretary/Treasurer; URW's Director of Education would become Local 881's Recorder; all the members of URW's board of governors would become the vice-presidents on Local 881's general executive board; and the supervisors from URW's professional staff would become the eight vice-presidents who also sit on Local 881's executive council.[4]

Under the merger agreement, the collective bargaining agreements already in place between the URW and the covered employers would remain unchanged, and the officers of Local 881 (who were identical to the former officers of the URW) would continue to administer these agreements. Under Local 881's by-laws, future collective bargaining agreements would continue to be negotiated on the local level, and contracts would continue to be ratified by a majority of the affected local membership, with UFCW reserving the right to request that initial bargaining proposals and the resulting agreements be submitted to the UFCW president before their submission to the general membership. Local 881 would have the exclusive authority to interpret and enforce the collective bargaining agreement, to submit grievances to arbitration, and to withdraw or settle grievances. Further, just as the URW had required a two-thirds vote of the affected membership present at a special meeting to authorize a strike, Local 881 would require

the same, with one added wrinkle: any strike would have to then be approved by the UFCW. Local 881 also retained the authority to set its own dues. However, the procedure would be changed in that, whereas URW dues were set by the stewards, Local 881's dues would be set by majority vote of its members and would be subject to the minimums set forth in the UFCW constitution and the approval of the UFCW. Unlike the URW, the UFCW charges its locals a per capita monthly tax, but the merger agreement exempted Local 881 from such charges for three years.

After the merger referendum results were certified and reported, all covered employers recognized Local 881 as the valid successor to the URW and honored existing collective bargaining agreements—all covered employers, that is, except Venture. Venture asserted that it need not recognize or bargain with Local 881 because non-URW-member employees of the covered employers were not permitted to vote in the merger referendum, citing the "*Amoco* rule." *See Amoco Production Co.*, 262 N.L.R.B. 1240 (1982), *aff'd sub nom. Local Union No. 4–14, Oil, Chemical & Atomic Workers International v. NLRB*, 721 F.2d 150 (5th Cir.1983).[5] Under this rule, the Board would not require an employer to bargain with a post-merger or post-affiliation union unless it determined, as a threshold matter, that *all* employees in the bargaining unit, not merely union members, were permitted to vote on the change.

Back in 1984, the NLRB agreed with Venture, and ruled that, pursuant to the *Amoco* rule, Venture did not violate the Act by refusing to recognize Local 881 because non-URW-members were not permitted to vote in the merger referendum. *May Department Stores Co.*, 268 N.L.R.B. 979 (1984). Local 881 petitioned this court for review and, in our first crack at this case, we affirmed. *United Retail Workers*

---

**4.** The parties stipulated that Local 881 has also retained the remainder of URW's professional staff.

**5.** For a thorough and then-current discussion of the troubled history of the *Amoco* rule, in which

the Board itself reversed its position no fewer than three times, see our first opinion in this case, *United Retail Workers Union, Local 881 v. NLRB*, 774 F.2d 752, 755–58 (7th Cir.1985).

*Union, Local 881 v. NLRB*, 774 F.2d 752 (7th Cir.1985). After examining the split that then existed in the federal courts of appeals and the conflicting policies involved, we held that the Board's decision to adopt and apply the *Amoco* rule was rational and consistent with the Act. *Id.* at 758–64. Local 881 pressed on, however, and petitioned the Supreme Court for a writ of certiorari.

While Local 881's petition was pending, the Supreme Court issued its opinion in *NLRB v. Financial Institution Employees of America, Local 1182 (Seattle–First National Bank)*, 475 U.S. 192, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986) (*"Sea–First"*), an appeal from a decision of the Ninth Circuit. In *Sea–First*, the Court held that "the Board exceeded its authority under the Act in requiring that nonunion employees be allowed to vote for affiliation before it would order the employer to bargain with the affiliated union." *Id.* at 209, 106 S.Ct. at 1016 (footnote omitted). The Court explained that the *Amoco* rule "violated the policy Congress incorporated into the Act against outside interference in union decisionmaking." *Id.* at 204, 106 S.Ct. at 1014 (citations omitted). In light of *Sea–First*, the Court granted Local 881's petition for a writ of certiorari, vacated our judgment, and remanded the case to us for further consideration. *United Retail Workers Union, Local 881 v. NLRB*, 475 U.S. 1138, 106 S.Ct. 1787, 90 L.Ed.2d 333 (1986).

On remand, we found that the Board had similarly exceeded its authority by rejecting the URW/UFCW merger because nonunion employees could not vote. We therefore granted Local 881's petition for review and reversed the NLRB's decision to adopt and apply the *Amoco* rule. *United Retail Workers Union, Local 881 v. NLRB*, 797 F.2d 421, 422–23 (7th Cir.1986). We expressed no opinion, however, as to the propriety of other aspects of the merger, and remanded the case to the Board for further proceedings. The Board then reconsidered the matter and issued the decision and order at issue here.

With the elimination of their *Amoco* rule-based objection, Venture had to establish some other fatal defect(s) in the merger if it was to escape a finding by the Board that Venture's refusal to recognize Local 881 was an unfair labor practice. To this purpose, Venture presented to the Board two new attacks on the merger: 1) the URW's failure to conduct the merger referendum on a unit-by-unit basis violated the employees' due process rights, and 2) the merger sufficiently altered the identity of the union that "continuity of bargaining representative" has not been preserved. The Board rejected both of these purported defects, and found no "question concerning representation," *see Sea–First*, 475 U.S. at 202–03 & 207, 106 S.Ct. at 1012–13 & 1015, that would justify Venture's actions. *Board Decision* at 11–16. The Board therefore found that Venture had engaged in unfair labor practices in violation of the Act and ordered that, among other things, Venture must now recognize and bargain with Local 881. *Id.* at 16–21. Venture then filed a post-decision motion requesting that the Board reopen the record to receive certain "newly discovered evidence." On October 25, 1988, the Board denied this motion.

Venture filed a timely petition to this court, challenging both the Board's finding that the merger was proper and the Board's refusal to reopen the record. We have jurisdiction over this petition, and over the NLRB's cross-petition for enforcement, under §§ 10(e) and (f) of the Act, 29 U.S.C. §§ 160(e) and (f).

## II.

We note at the outset that Venture is not entitled to a *de novo* consideration by this court of its unsuccessful challenges to the merger. The core issue here is whether the merger raises a "question concerning representation," which occurs when "it is unclear whether a majority of employees continue to support the reorganized union." *Sea–First*, 475 U.S. at 202, 106 S.Ct. at 1013. The Board makes two central findings which determine this issue: whether the merger/affiliation election was con-

ducted with adequate due process safeguards, and whether there is "substantial continuity" between the pre- and post-merger unions.[6] Such determinations are very fact-specific, and are to be made in the first instance by the Board. We will defer to and enforce the Board's findings on these issues unless the petitioner establishes that they are not supported by substantial evidence on the record as whole. *See Seattle–First National Bank v. NLRB*, 892 F.2d 792, 797 (9th Cir.1989); *NLRB v. Insulfab Plastics, Inc.*, 789 F.2d 961, 965 (1st Cir.1986). *See generally David R. Webb Co., Inc. v. NLRB*, 888 F.2d 501, 503 (7th Cir.1989) (discussing standards of review for NLRB findings and conclusions); *Northern Wire Corp. v. NLRB*, 887 F.2d 1313, 1317 (7th Cir.1989) (same).

### A. Due Process

The NLRB has long held that an employer's bargaining obligation continues after a merger or affiliation only if the union members were given a fair opportunity to consider and vote on the change. This requirement has traditionally involved the Board in examining whether the relevant election was conducted in accordance with "due process safeguards," including, particularly, notice of the election to all eligible voters, an adequate opportunity for discussion prior to the vote, and reasonable precautions to maintain the integrity and secrecy of the ballot. *See, e.g., F.W. Woolworth Co.*, 285 N.L.R.B. No. 119, slip op. at 3 (1987), *enforced*, 892 F.2d 1041 (4th Cir.1989); *Newspapers, Inc.*, 210 N.L.R.B. 8, 9 (1974), *enforced*, 515 F.2d 334 (5th Cir.1975); *Equipment Mfg., Inc.*, 174 N.L.R.B. 419, 419–20 (1969). In this case, the Board applied this due process test to the stipulated facts regarding the conduct of the URW/UFCW merger referendum. After cataloguing the various pre-merger mailings and meetings and the handling and tallying of the secret ballots, the Board concluded as follows:

The foregoing events make it clear that URW members, including [Venture's] employees, were given sufficient notice of the election, an opportunity to discuss and make an informed decision regarding affiliation, and an opportunity to vote. It is equally clear that the integrity and secrecy of the ballots were maintained. Accordingly, we find that due process was observed in the conduct of the referendum.

*Board Decision* at 13.

Venture does not challenge the Board's application of this traditional due process inquiry, nor does it challenge the Board's finding based on that inquiry. Instead, Venture suggests that an additional requirement should be added to the test. Venture asserts that the Board should require, "as a threshold condition of recognizing the validity of the affiliation election, that employees in each unit be given a separate opportunity to vote on the affiliation issue." Thus, the URW should have had to segregate and tally the merger ballots on a unit-by-unit or employer-by-employer basis.

■ While we applaud Venture's apparent concern for its employees' due process rights, we agree with the Board's conclusion that "there is no merit to [Venture's] contention that it has no duty to bargain with [Local 881] because, as a result of the commingling of ballots in the affiliation vote, the precise vote [by Venture's URW-member employees] cannot be known." *Board Decision* at 13. It has been and continues to be well established that post-merger or post-affiliation unions need not show, as a pre-condition to their recognition, that a majority of employees in a particular employer unit voted in favor of the change. *See, e.g., NLRB v. Eastern Connecticut Health Services, Inc.*, 815 F.2d 517, 518–19 (2d Cir.), *cert. denied*, 484

---

**6.** Although the Court in *Sea–First* discussed this traditional two-pronged test, it neither endorsed nor rejected it, as the issue before the Court was not the propriety of the Board's past approaches but the new *"Amoco* rule." 475 U.S. at 198–201, 199 n. 6 & 200 n. 7, 106 S.Ct. at 1010–12, 1011 n. 6 & 1011 n. 7. The Board has continued after

*Sea–First* to consider both due process and continuity, though with a decided emphasis on the latter. *See, e.g., Quality Inn Waikiki*, 297 N.L.R.B. No. 71 (1989); *Seattle–First Nat'l Bank*, 290 N.L.R.B. No. 72 (1988), *enforced*, 892 F.2d 792 (9th Cir.1989).

U.S. 845, 108 S.Ct. 140, 98 L.Ed.2d 97 (1987) ("since the affiliation decision was primarily an internal matter for the union, [citing *Sea–First*, 106 S.Ct. at 1015–16], no question of representation is raised by the union's decision not to require unit-by-unit approval of the changes"); *House of the Good Samaritan*, 248 N.L.R.B. 539, 539 (1980) ("where, as here, complete continuity in representation has been maintained, a separate vote by Respondent's employees is not required"); *Aurelia Osborn Fox Memorial Hospital*, 247 N.L.R.B. 356, 359 (1980) (same) (citing *American Enka Co.*, 231 N.L.R.B. 1335, 1337 (1977)). The Board also routinely approves union organizational changes in which members' votes are collected on a multi-unit basis and the ballots are considered collectively. *See, e.g., F.W. Woolworth Co.*, 285 N.L.R.B. No. 119, ALJ decision at 10; *American National Insurance Co.*, 281 N.L.R.B. 713, 714 n. 2 (1986); *Montgomery Ward & Co., Inc.*, 188 N.L.R.B. 551, 551–52 (1971).[7]

Apart from its lack of precedential support, Venture's suggested requirement is also inconsistent with the spirit, if not the letter, of *Sea–First.* In *Sea–First*, the Supreme Court recognized that industrial stability, the concern underlying the Act, "would unnecessarily be disrupted if every union organizational adjustment were to result in displacement of the employer-bargaining representative relationship." 475

U.S. at 202–03, 106 S.Ct. at 1013 (quoting *Canton Sign Co.*, 174 N.L.R.B. 906, 909 (1969)). The Court also stated that "[the Act] does not require unions to follow specified procedures in deciding matters such as affiliations," 475 U.S. at 199 n. 6, 106 S.Ct. at 1011 n. 6, and that "[the Board] has no authority to prescribe internal procedures for the union to follow in order to invoke the Act's protections." *Id.* at 207–08, 106 S.Ct. at 1015–16. Venture's suggested requirement would force the Board to micro-manage the collection and tallying of union referendum ballots in direct contradiction to these admonitions and to the general message of *Sea–First* that affiliations or mergers, like a union's decision to alter its own constitution, are basically internal union affairs. *See id.* at 206, 106 S.Ct. at 1015.[8] The Board in this case properly recognized the message of *Sea–First* when it rejected Venture's suggested unit-by-unit voting requirement: "[A]n employer has no more right to seize the occasion [of a merger or affiliation] for questioning majority sentiment in the unit than it would have if the bargaining representative had simply changed its own constitution." *Board Decision* at 13 (citing *Sea–First* ).

Substantial record evidence supports the Board's finding that the procedures under which the URW/UFCW merger was conducted comport with due process, and

---

7. Venture's reliance on *William B. Tanner Co. v. NLRB*, 517 F.2d 982 (6th Cir.1975), is misplaced. The Sixth Circuit did there deny enforcement to a Board order which held, over Board Member Kennedy's dissent, that a post-merger local was a qualified successor to the pre-merger local. *William B. Tanner Co.*, 212 N.L.R.B. 566 (1974). The court did *not*, however, explicitly adopt a unit-by-unit vote-counting requirement for merger elections, nor did it adopt Member Kennedy's dissent, as Venture suggests. The other cases cited by Venture are similarly inapposite. In most of them, the fatal problem with the union's organizational change was that it was unclear whether employees of a particular unit or units were given an equal opportunity to vote in a commingled, multi-unit election. *See, e.g., Rinker Materials Corp.*, 162 N.L.R.B. 1688 (1967); *Yale Manufacturing Co.*, 157 N.L.R.B. 597 (1966). It is undisputed here that Venture's employees had an adequate and equal opportunity to vote. The remaining cases are simply factually distinguishable. *Insulfab Plastics* in-

volved a single-unit union, which explains the out-of-context quotation supplied by Venture: "employees in the bargaining unit [i.e. *all* the employees involved] must have had a fair opportunity, with adequate due process safeguards, to approve the organizational change." 789 F.2d at 965. In *NLRB v. Canton Sign Co.*, 457 F.2d 832 (6th Cir.1972), neither the pre- nor post-merger unions had ever been certified as the bargaining agent for Canton Sign Co.'s employees, and there was no evidence that any of these employees had ever chosen to become a member of either the pre- or post-merger unions. *Id.* at 834.

8. To the extent that *Tanner, supra* note 7, may conflict with our decision here and the Second Circuit's decision in *Eastern Connecticut Health Services*, 815 F.2d 517, we note that the latter two have been decided after the Supreme Court set out these statements in *Sea–First*, while the former was decided prior to *Sea–First*.

precedent and sound reasoning support the Board's decision to reject Venture's suggested additional requirement. We therefore accept the Board's due process finding.

### B. Continuity

The second condition the NLRB has traditionally placed on an employer's duty to bargain with a post-merger union is "substantial continuity" between the pre- and post-merger unions. In making the continuity determination, the Board generally compares the entities in light of a number of factors, including "structure, administration, officers, assets, membership, autonomy, by-laws, size, and territorial jurisdiction," *NLRB v. Pearl Bookbinding Co., Inc.*, 517 F.2d 1108, 1111–12 (1st Cir. 1975), with an eye toward changes in the "rights and obligations of the union's leadership and membership, and in the relationships between the putative bargaining agent, its affiliate, and the employer." *J. Ray McDermott & Co. v. NLRB*, 571 F.2d 850, 857 (5th Cir.), *cert. denied*, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978). *Accord National Posters, Inc. v. NLRB*, 885 F.2d 175, 179 (4th Cir.1989) (discussing the same continuity test); *Insulfab Plastics*, 789 F.2d at 966 (same). No strict check-list is used, however. The Board considers " 'the totality of a situation.' [*Yates Indus., Inc.*, 264 N.L.R.B. 1237,] 1250 [ (1982) ]. Continuity is evidenced by the maintenance of traces of a preexisting identity and the retention of autonomy over the day-to-day administration of bargaining agreements." *News/Sun Sentinel Co. v. NLRB*, 890 F.2d 430, 432 (D.C.Cir.1989).

In *Sea–First*, the Supreme Court highlighted the importance of continuity by equating the "question concerning representation" inquiry with a concern for "changes [that] are sufficiently dramatic to alter the union's identity." 475 U.S. at 206, 106 S.Ct. at 1015. Since *Sea–First*, the Board has continued to examine the same kind of factors, though it has seized on *Sea–First*'s language and rephrased the continuity inquiry as a search for changes that are "sufficiently dramatic to alter the union's identity." *See, e.g., Seattle–First*

*National Bank*, 290 N.L.R.B. No. 72, slip op. at 3–9 (1988), *enforced*, 892 F.2d 792 (9th Cir.1989); *Garlock Equipment Co.*, 288 N.L.R.B. No. 31, slip op. at 3–6 (1988); *Western Commercial Transport*, 288 N.L. R.B. No. 27, slip op. at 6–13 (1988).

In this case, the Board similarly conducted a comparative analysis of the pre- and post-merger unions in search of a "dramatic alteration of identity." *Board Decision* at 14–16. The Board began by noting that the record established a "slight diminution in autonomy in relation to the UFCW International." *Id.* at 14. The Board then reviewed the following specific features of the URW/UFCW merger: the Local 881 officers were identical to the officers elected to run the URW; the authority of these local officers to negotiate agreements, fashion proposals and discipline members remained constant; the authority of Local 881 members to ratify collective bargaining agreements and call strikes was "virtually identical" to that of URW members; Local 881 retained all URW property and assets; there was no evidence of a merger-related dues increase; former URW members in good standing automatically became Local 881 members; and Local 881 stood ready to assume all agreements between the URW and the covered employers, including Venture, and attempted to do so. *Id.* at 15. The Board ultimately concluded as follows: "In view of the retention of local officers and assets and the corresponding evidence showing that there has been no substantial impairment or reduction of local autonomy, we find that continuity of representation has been preserved." *Id.* at 16.

As we noted above, Venture, as the party challenging this finding, has the burden of establishing that it is not supported by substantial evidence on the record as a whole. *See News/Sun Sentinel*, 890 F.2d at 432 (challenging employer has burden of proving discontinuity, and Board findings regarding continuity are conclusive if supported by substantial record evidence) (citing *Insulfab Plastics*, 789 F.2d at 966). To this end, Venture focuses on three provisions of the

URW/UFCW merger agreement and/or the UFCW constitution which it claims work a "dramatic shift" in continuity: 1) the right of the UFCW to review bargaining proposals and final agreements before their submission to the Local 881 members, 2) the fact that the UFCW must authorize any local strikes, and 3) the fact that Local 881's dues are subject to UFCW minimums and approval by the UFCW president.[9]

Faced with these same arguments by Venture, the Board found that "these reserved rights of approval, allowing the [UFCW] only to react to initiatives of the local, do not serve to supplant the local as the entity primarily responsible for the conduct of its affairs." *Board Decision* at 16. Substantial record evidence supports this finding. First, the record reflects that primary control over the negotiation and implementation of collective bargaining agreements is vested in Local 881's officers and that the ultimate authority to reject or accept agreements lies with the local members. True, the UFCW can request that initial proposals and final agreements be submitted to it for approval, and it can assign a representative to assist the local officials in bargaining. However, the proposals and ultimate agreements are developed, negotiated and ultimately approved or rejected entirely on the local level. Second, the record reflects that the strike-authorization procedure was not altered significantly by the merger. Both before and after the merger, a two-thirds vote of the affected membership is required to call a strike. Although the UFCW constitution requires that the UFCW president must also approve a local strike, the principal consideration of the merits of a strike determination remains in the hands of the affected members. Third, with regard to setting dues, the local membership again retained primary authority, limited only by the minimums set forth in the UFCW constitution (a document with which the URW members were provided before voting on the merger) and the UFCW president's approval. Moreover, the Board's continuity determination finds additional support in other aspects of the merger already noted, most particularly the fact that Local 881's leadership is identical in personnel and authority to that of the URW, and that these identical officers retained the exclusive authority to interpret and enforce the collective bargaining agreement and to handle grievances.

Thus, as Venture has failed to establish that the Board's continuity finding is not supported by substantial record evidence, we accept that determination, as well as the Board's ultimate conclusion that the URW/UFCW merger does not raise a question concerning representation. *Cf. Seattle–First National Bank*, 892 F.2d at 799–802 (affirming Board determination that sufficient continuity was present and that no question concerning representation

---

9. We disregard Venture's contention that the mere difference in numerical and geographic size between the URW and the UFCW "demonstrates a significant diminution in the ability of the union to represent the interests of its members." If this argument was accepted, every merger or affiliation of a small independent union with an international would, *per se,* raise a question concerning representation. Yet, the increased size, financial support and bargaining power that such mergers create are the very factors recognized by the Supreme Court in *Sea–First* as the ordinary, valid reasons for mergers. 475 U.S. at 198–99 & 199 n. 5, 106 S.Ct. at 1010–11 & 1011 n. 5. In this way and others, the Court in *Sea–First* strongly suggested that, without some actual evidence of loss of continuity, most mergers between independent unions and internationals do not raise a question concerning representation. To the extent

that the trilogy of Third Circuit cases cited by Venture, *Sun Oil Co. v. NLRB,* 576 F.2d 553 (3d Cir.1978); *NLRB v. Bernard Gloekler N.E. Co.,* 540 F.2d 197 (3d Cir.1976); and *American Bridge Div., U.S. Steel Corp. v. NLRB,* 457 F.2d 660 (3d Cir.1972), support Venture's suggested *per se* rule, they are of questionable precedential value in light of *Sea–First. See Seattle–First Nat'l Bank,* 892 F.2d at 797–98 (rejecting the argument that the affiliation of a small independent with an international *per se* destroys continuity and raises a question concerning representation, and discussing doubt as to continuing validity of Third Circuit cases after *Sea–First* ); *Insulfab Plastics,* 789 F.2d at 967–68 (same). *See also News/Sun Sentinel,* 890 F.2d at 433 ("If, as in this case, sufficient indicia of continuing autonomy are present, numerical disparities in voting strength will not force a finding of discontinuity.")

was raised on facts quite similar to those here); *Insulfab Plastics,* 789 F.2d at 966–68 (same).[10]

### C. The Refusal to Reopen the Record

██ Apart from its challenges to the propriety of the merger, Venture also takes issue with the Board's denial of its motion to reopen the record. NLRB regulations provide that the Board may reopen the record and conduct a new hearing when a party presents evidence "which has become available only since the close of the hearing," and which, "if adduced and credited, ... would require a different result." 29 C.F.R. § 102.48(d)(1). The requesting party must also explain why the evidence was not presented previously. *Id.* The decision to grant or deny a new hearing under this rule is within the sound discretion of the Board, and will only be disturbed by a reviewing court if the challenging party establishes an abuse of discretion. *See Seattle–First National Bank,* 892 F.2d at 797; *Hercules, Inc. v. NLRB,* 833 F.2d 426, 430 (2nd Cir.1987); *NLRB v. Cutter Dodge, Inc.,* 825 F.2d 1375, 1380–81 (9th Cir.1987). This Venture has failed to do.

██ Venture's motion argued that Venture possessed "newly discovered additional evidence" concerning the number of Venture employees still represented by what was the URW. Venture contended that this evidence, if believed, would show that this number had "drastically declined" since the merger referendum, and that therefore the Board's bargaining order was an inappropriate remedy. In an unpublished decision and order, the Board denied Venture's motion for two reasons: 1) Venture did not contend that Local 881 had lost majority support, only that support had "drastically declined;" thus, the additional evidence, even if accepted, would not require a different result, and 2) even viewing Venture's allegation as one of a loss of majority support, the policies of the Act do not allow an employer (such as Venture) who has unlawfully withdrawn recognition to rely on the delay-related changes caused by that withdrawal to question the union's continuing majority status.[11] These Board conclusions are quite reasonable and well within the Board's discretion.

Venture's request by its own terms does not meet the requirements of 29 C.F.R. § 102.48(d)(1) in that it does not allege the existence of newly discovered evidence

**10.** Venture points for support to two NLRB cases contemporaneous with the Board's decision here in which continuity was found to be lacking and which, it asserts, involved "strikingly similar facts." *Garlock Equipment,* 288 N.L.R.B. No. 31 (1988); *Western Commercial Transport,* 288 N.L.R.B. No. 27 (1988). A review of these cases, however, reveals that they arose from markedly different facts than involved here. In *Garlock Equipment,* an "amoeba-simple" independent union confined to the employees of a single company became part of an existing district lodge (rather than becoming a self-contained, autonomous local of the international as the URW did here). 288 N.L.R.B. No. 31, slip op. at 3–4. Further, the officers and members of the former independent effectively lost all power to negotiate and administer collective bargaining agreements to the officers of the district lodge. *Id.* at 5. *Western Commercial Transport,* too, involved the submersion of a single-employer independent into an existing district lodge, with the members of the old unit receiving no effective power to choose their delegates and representatives. 288 N.L.R.B. No. 27, slip op. at 6–7, 9–10. Moreover, unlike here, in *Western Commercial Transport* the incum-

bent officers were replaced by individuals from the international who had no previous connection with the unit, and these individuals managed day-to-day representation matters. *Id.* at 6–9.

**11.** The Board also distinguished *Impact Industries, Inc. v. NLRB,* 847 F.2d 379 (7th Cir.1988), the case on which Venture primarily relies, on the ground that at issue there was the propriety of a *"Gissel* order," which is an extraordinary remedy to be used to force employers to bargain with unions that have not won representation elections because the employer's pre-certification-election unfair labor practices have made a fair election unlikely. *See NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). *See also NLRB v. Western Temporary Services, Inc.,* 821 F.2d 1258, 1270 (7th Cir.1978) (distinguishing the *Gissel* order context). In this case, by contrast, Venture has been ordered to bargain with a successor to the incumbent union from which Venture withdrew recognition during the term of a collective bargaining agreement. We agree with the Board's conclusion that *Impact Industries* is inapposite.

which "would require a different result." A reduction in support, even if "drastic," would not render a bargaining order inappropriate unless it raised a good faith doubt as to the union's majority status, an allegation which Venture has not made. *See Zim's Foodliner, Inc. v. NLRB,* 495 F.2d 1131, 1141 (7th Cir.), *cert. denied,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974) ("Numerous cases hold that employee turnover, standing alone, does not give rise to good faith doubts regarding a union's majority status."); *NLRB v. Creative Food Design Ltd.,* 852 F.2d 1295, 1300–01 (D.C. Cir.1988). Further, the Board's policy-based rejection of Venture's request is reasonable and well-supported. As this court and others have often noted, to allow employers to avoid bargaining orders by pointing to changes in the bargaining unit that have occurred because of the delay attendant to their continued refusal to recognize the union would "put a premium on protracted litigation by encouraging employers to delay compliance in the hope that new and favorable circumstances would develop." *Cutter Dodge, Inc.,* 825 F.2d at 1381. *See also NLRB v. Aquabrom,* 855 F.2d 1174, 1184–85 (6th Cir.1988) ("A union's support will usually erode over time, particularly where, as here, the union has never been given the chance to succeed.... [T]o permit [the employer] to rely on this inevitable erosion in a union's support [as a defense to a bargaining obligation] removes any incentive the [employer] might have to honor, without Board intervention, a remedial obligation, and, further, encourages litigation and rewards delay."); *Western Temporary Services,* 821 F.2d at 1270 (allowing changes in union membership caused by litigation-related delay to remove employers' duty to bargain "might encourage employers to file unmeritorious motions in the hope of eventually being relieved of their duty to bargain, either through sheer lapse of time or through inevitable employee turnover").[12]

## III.

Over eight years ago, the officers and members of the URW decided to merge their union with an international. Because Venture, only one of the companies with employees represented by the URW, disapproved of the merger, this long dispute has resulted. With the abolition of the *Amoco* rule, there is now no good reason to allow Venture to further delay in recognizing and bargaining with Local 881. Indeed, the cost and delay that have already been occasioned by this dispute provide persuasive support for the point finally and firmly stressed by the Supreme Court in *Sea-First:* union decisions to merge or affiliate should normally remain internal union matters out of which employers, the NLRB and the courts should stay. This sound rule of thumb should only be broken when there is real doubt as to the fairness of the procedures by which the merger or affiliation was approved, or when the merger or affiliation so changed the structure and function of the union that there is real doubt as to whether the resulting entity is "continuous" with the one elected by the members. The Board determined here that the URW/UFCW merger raised no such doubts or "questions concerning representation." Because this determination is supported by substantial evidence on the record as a whole, and because the Board did not abuse its discretion when it refused to reopen the record, Venture's PETITION FOR REVIEW is DENIED, and the NLRB's CROSS-PETITION FOR ENFORCEMENT is GRANTED.

---

12. Because we find reasonable the Board's articulated reasons for rejecting Venture's motion, we need not address Intervenor's additional argument that Venture has failed to show that (and why) the proffered evidence was previously unavailable.