### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### BERNARD GLOEKLER NORTH EAST CO., Respondent.

#### No. 75–1850.

United States Court of Appeals, Third Circuit.

Argued April 5, 1976.

Decided Aug. 23, 1976.

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

Henry W. Ewalt, Brooks & Ewalt, Pittsburgh, Pa., for respondent.

Before BIGGS, GIBBONS and HUNTER, Circuit Judges.

### OPINION OF THE COURT

BIGGS, Circuit Judge.

The National Labor Relations Board (Board) petitions for enforcement of an order issued by it against Bernard Gloekler North East Co. (Company)[1] on April 30, 1975. 217 NLRB No. 104. The Board found that Gloekler, a fabricator of steel, had violated sections 8(a)(5) and (1) of the National Labor Relations Act (Act), 29

Jersey, Chancery Division, Union County, No. C–3893–70.

1. The administrative caption spells the Company's name "Gloeckler." However, we notice that the Company's stationery and the briefs spell it as indicated in the title. We will order our caption amended accordingly.

U.S.C. § 151 *et seq.,* by refusing to bargain with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW). We have jurisdiction under 29 U.S.C. § 160(e). The issue presented is whether a question of representation is raised when an independent local, a party to a collective bargaining agreement in force, attempts to affiliate with a local of the UAW international union.

We find on these facts that such a question is presented and, deciding it against the Board, decline to enforce the Board's order.

## I. FACTS

The Administrative Law Judge (ALJ) found that "for 6 or 7 years" the independent local, Employee Representatives (Representatives), was recognized by the Company as the exclusive bargaining representative of its production and maintenance employees. On October 25, 1972, the membership of the Representatives voted without Board supervision to affiliate with the pre-existing Erie UAW Local 1461 (UAW local).

Early in 1972, Dominic Cassesa, an international representative of the UAW, was contacted by a Gloekler employee, Gilbert Lewis, to explore the possibility of the Gloekler employees joining the UAW. On February 11, 1972, Cassesa filed with the NLRB Regional Director for Region Six a charge which alleged that Gloekler unfairly "dominated and interfered" with the organization and administration of the Representatives.

The Regional Director refused to issue a complaint, finding that the Representatives had been formed "wholly on employee initiative." He found no sufficient evidence within the statutory period to support the UAW charge. This determination was upheld when appealed to the Office of the General Counsel.

Cassesa then petitioned the Regional Director for an investigation of employee representation and for a certification election to determine the Gloekler employees' exclusive bargaining agent. The Regional Director denied the petition, noting that the NLRB was prevented from acting by the contract-bar rule. The rule normally will not allow a Board election during certain times of a contractual period in order to preserve industrial stability and to support the integrity of lawful contract terms.[2] From the record it appears that no appeal from this administrative finding was taken by the UAW.

Cassesa then indicated to some members of the Representatives' executive committee that the independent could affiliate with the UAW, if all officers were so disposed. Representatives' President Richard Forsell opposed affiliation. Forsell was confronted with a petition circulated and signed by approximately fifty percent of the "men" and he resigned from the committee, to be replaced by a committee member favoring affiliation. When informed that Forsell had resigned, Cassesa told a committee member that "we have a scheme . . . [W]e can proceed with affiliation". Transcript, page 182.

According to the ALJ's summary of the General Counsel's case, which the ALJ did not dispute in his ultimate findings of fact, Cassesa attended at least four meetings with the Representatives' executive committee, one of which was prior to the investigation and certification petition. After Cassesa was informed that Forsell had stepped aside, Cassesa met with all, save one, of the committee as then constituted, and discussed affiliation.

Another meeting of the committee with Cassesa was held to organize the affiliation vote, followed "a few days later" by a third meeting, when Cassesa presented a draft affiliation resolution. There is no evidence that this resolution was any way amended or changed by the committee. One of its seven members, Grant Tanner, did not sign the resolution.

---

2. *See generally* 2 CCH Labor Rel.Rptr. ¶ 2730 (1972); *General Cable Corp.,* 139 NLRB 1123 (1962); *American Seating Co.,* 106 NLRB 250 (1953).

The Company argues that actions and representations by Cassesa and the UAW during this period prior to the membership vote provided "the thrust and motivation" behind the affiliation. Cassesa did promote affiliation by enumerating for the committee the UAW benefits available through affiliation; and by promising no change in employee dues under the current contract, no UAW initiation charge for the current membership, and UAW sponsorship of a beer party if the affiliation vote were carried. Presumably through Cassesa, the UAW did rent the hall in which the affiliation vote was taken and provided the stamps and envelopes for the meeting's notice. Cassesa also sought an invitation to that meeting.

Cassesa attended the membership meeting to consider affiliation, accompanied by two other UAW representatives. The Representatives' president, Ralph Neal, presided. The Cassesa resolution was read and Neal said that he favored affiliation. During the ensuing discussion, he referred some questions to Cassesa. Prior to the meeting, Cassesa coached Neal as to how the meeting and vote were to be conducted. The ALJ expressly found that Cassesa did not control the meeting. Opinion of ALJ, page 20.

The vote was 48 "yes" tallies for affiliation and 15 "no" tallies. General Counsel Exhibit 11.[3] After the vote was announced, Cassesa urged "unity" upon the employees. He told them that they were "assigned" to the pre-existing UAW local, which had an "[a]malgamated charter in the City of Erie" and a treasury "for" them. Cassesa also produced an affiliation notification letter for the Company, which, in substance, stated that the vote had only changed the name of the Representatives to that of the UAW local with "[a]ll [its] officers and functional leaders" remaining the same. Further, the letter declared that there would be no change in the "continuity" of the union's organization and the newly-named UAW local would honor all contractual provisions. General Counsel Exhibit 9.

At the hearing before the ALJ, counsel for the Company attempted to introduce evidence pertaining to the nature of representation provided by the UAW local and the international UAW, which the ALJ excluded. This evidence consisted of the UAW local's 1967 registration filing with the Department of Labor; the Department filings detailing the finances of the UAW local for 1967 to 1970;[4] the by-laws of the local; the constitution of the international; and the 1972 Department annual report of the international.

The material excluded indicated that the UAW local had been chartered in 1967, over five years before the Company employees voted to join it. UAW local financial statements declared dues receipts (from an undisclosed membership) ranging from $3,703 to $5,116. Dues were collected in the amount of two hours pay per month for each member. These statements also disclosed that the international paid strike benefits to the UAW local for a period of fifteen days in 1968. The international's financial statement showed international "per capita tax" collections of $96,089,387.

The by-laws of the UAW local have several provisions relevant to shop grievance resolution. Article 19 specifies that the executive board of the UAW local is to assess the "validity" of cases which "appear" to require arbitration. Article 12 defines requirements for shop officers within the UAW local. These relate to the officers' tenure in the shop and their diligence in attending membership meetings. Article 6 defines the powers of administration of the UAW local's executive board, giving it the right to act for the membership when "urgent business requires," subject to subse-

---

3. There is a discrepancy in the record. There was possibly one more vote for, and one less against, affiliation. Opinion of ALJ, p. 6.

4. No forms appear for the years 1971 and 1972. Cassesa's remarks at the end of the affiliation vote imply that the UAW local was still in existence. Testimony of Cassesa indicated that, at the time of the hearing in 1974, the UAW local represented five to eight employees of another company. Tr. 174. Dues for 1967–1970, text *infra*, indicate a larger membership for this period.

quent membership ratification in "vital" matters.

Article 50 § 4 of the excluded UAW international constitution specified that no strike could be called by a local except by exclusive authorization of the executive board or president of the international and in conformity with the international constitution. Article 50 § 8 specified that in cases of "great emergency," where the "existence" of the international was at stake, a general strike could be called by two-thirds vote of the executive board, if approved by referendum vote of the membership. In addition, in Article 19 § 6 the UAW international pledged itself to "protect" those UAW locals having superior wage and condition agreements from "infringement by other UAW locals having inferior agreements. The by-laws of the UAW local specified that "all strikes . . . called shall be in strict conformity with the [i]nternational [c]onstitution." Article 4 § 3, Article 8.

The ALJ found these exhibits "irrelevant" without elaboration. Transcript, pages 174–79, 196. The Company had argued they were relevant and revealed that substitution of the UAW local would change the financial resources of a contracting party, as well as its governance. The Company specifically excepted to these exclusions. The Board never addressed them, although it did uphold generally the ALJ "to the extent consistent" with the Board's opinion and judgment. Opinion of Board, page 1. The Board does not broach the irrelevance issue here, but argues that there was no palpable change in representation.

## II.  LAW

On review the Board never directly addressed the issue of how the representation of the UAW local might differ from that of the Representatives. One of the three Board members dissented from the Board's upholding of the ALJ's determination, arguing that the UAW was attempting to substitute an entirely different labor representative, in effect, raising a question of representation. Dissenting Opinion, pages 11–13. If the dissent's position were correct, the Regional Director's previous application of the contract-bar rule would foreclose at the time in question a Board certification election.

In *Universal Tool & Stamping Co.,* 182 NLRB 254, 259 (1970), the Board summarized well the relevant law:

"It is well established that an employer is required to continue to recognize a union with which it has a collective-bargaining contract so long as that contract bars a Board representation election. This obligation, which is rooted in judicially approved contract bar principles the Board has adopted in light of the need to stabilize bargaining relations with due regard being accorded to the statutory right of employees freely to select their bargaining representative, is not affected by the union's loss of majority support during the contract term. . . . However, there may be circumstances when a contract no longer serves as a stabilizing force in bargaining relations as when a contracting union becomes defunct and ceases to exist or a schism develops from a basic intraunion dispute. In such a case, the employer is generally relieved of his bargaining duty until the question of representation is resolved at a Board election. *On the other hand, where a union is actually the continuation of another union under a different name as a result of affiliation, disaffiliation, merger, or the formation of a new organization and the predecessor union ceases to exist or unequivocally abandons its bargaining rights, its successor, in the proper case, may be entitled to the predecessor's bargaining and contractual rights.* In that event, an employer's refusal to recognize and deal with the successor organization violates Section 8(a)(5) and (1) of the Act." (citation omitted and emphasis supplied)

We must ascertain whether, under this law, the record contains substantial evidence to support a finding of continuity of the same representation. The Company's

obligation to bargain hinges on this determination. We find that the amalgamated UAW local is not "the continuation of another union under a different name" and that a question of representation confronted the Company.

In its representation petition to the Regional Director, the UAW argued that the Representatives were not the employees' appropriate representative. The UAW requested that the Board hold a certification election, implying that the UAW provided a distinct representation alternative.

When the contract-bar rule was found to forbid such an election, the UAW changed its position. In the letter notifying the Company of the affiliation election's result, the UAW attempted to characterize its advent as representative as a change of form, not of substance. If the Representatives had been previously certified by the Board,[5] the UAW would have been required to make the same argument to obtain amendment of certification. Since we find that the policy considerations applicable here are the same as those applicable in an amendment situation, we look to the amendment precedent for guidance.

In *American Bridge Division, U.S. Steel Corp. v. NLRB*, 457 F.2d 660 (3d Cir. 1972), the union seeking affiliation was an independent. The executive committee of the union, without consultation with the membership, engaged in affiliation discussions with the United Steelworkers of America (USW), a large international union with over one million members. *Id.* at 662. The USW facilitated an affiliation election by participating in a series of talks with the independent's officers and by attending the election meeting, where USW representatives expressed their views and answered questions. The company refused to recognize the USW local after the USW had carried the election and obtained amendment of certification from the Board.

Judge Rosenn for the Court adopted a "Board" test prohibiting amendment where there existed a question of representation. Amendment was to be denied if any of three conditions existed: the certified union opposed amendment, the bargaining unit did not remain the same, or the employees were not fully able to democratically consider and vote upon affiliation . *Id.* at 663. Under this test, the Court found that the bargaining unit in *American Bridge* had changed and the affiliation vote did not give the employees proper opportunity to consider affiliation.

Under the Court's analysis, it was enough to find a palpable change in representation if the new local were a "far different organization because the people who [would] conduct a substantial part of the unit's dealings with management [were] no longer the [independent's] officers, and the power of the unit's members to control those agents [had] radically changed." *Id.* at 663. The Court emphasized in its finding (a) that control over the independent's membership had been shifted to an international union of a much greater size; (b) that, although the local officers and the contract remained the same, "the rights of the parties [had] been changed" by the creation of new rights vested in the international. These included options to approve strikes and to assist in the adjustment of grievances. *Id.* at 664. In effect, the Court found that "[t]he very act of affiliation . . . [was] a commitment to [a] change in the fulcrum of union control and representation." *Id.*

Here, as in *American Bridge*, the Company would be facing a markedly different contractual partner if the UAW local were to represent the employees. In this regard, the material excluded by the ALJ is certainly relevant. It shows the prior existence of the UAW local with membership and resources which could augment the economic power of the Company's employees.

---

5. We find no evidence in the record that the Representatives local has ever been certified by the Board. Opinion of ALJ, p. 18; Tr. 40–41, 114. Paragraph 5 of the Company's Answer avers ". . . there has been no [B]oard certification of the [Representatives]." General Counsel Ex. 1(u).

Further, the excluded material points to the substantial control the new amalgamated entity might exercise over settlement of employee grievances. The material also indicates curtailment of the employees' ability to make strike determinations independent of the UAW local or the international.

With regard to the processing of grievances, it is relevant that the amalgamated UAW local would be a total [6] merger of two pre-existing locals. It is at best unclear whether existing UAW local by-laws, *supra*, would change the nature of grievance representation in the plant. Under the contract, the employee grievance committee is designated by name. It would appear that the UAW local's by-laws could affect this named committee's autonomy. The UAW local's executive committee, elected by the membership of the amalgamated local, would have a veto over the committee's treatment of potential arbitration cases. Indeed, the shop representative requirements of the by-laws might even disqualify the named members of the committee, who have not been subject previously to such strictures. Finally, to the extent a grievance against the company might prevent a problem "urgently" in need of solution, the amalgamated UAW local's executive committee could act unilaterally for a period of time with or without the approval of the named committee.

If grievance procedures proved inadequate in a particular case, from the employees' perspective, the merger with the UAW local would affect their plant autonomy when a strike is contemplated.[7] The financial autonomy of the employees would be affected, because, if there were to be a strike, the employees' resources could be augmented by the UAW local and the international. In the past the international has augmented the local's resources with strike benefits. Further, with or without resources, the employees' power to strike would be removed by the UAW's international constitution.

Thus the Company would be dealing with a union with different economic options and with a different locus of power. If the UAW constitution is any guide, this power could be used aggressively to affect Company contracting-out decisions. The UAW commits itself to protect the Company's employees against economic harm from other UAW laborers doing the same kind of work, but with less favorable agreements. On its face, this commitment would make the international at least interested in examining any Company contracting-out to less-favored workers.

All this leads us to find that the affiliation vote raised a question of representation and the Company had no duty to deal with the UAW local. There has been "a change in the fulcrum of union control and representation." The Representatives' structure, administration, assets, membership, autonomy, and by-laws have been changed.[8]

To hold that the UAW-facilitated affiliation is proper would be to say that, where there is a question of representation the contract-bar rule is only a temporary obstacle to an international and/or an independent bent on changing substantially a company's contractual party. It is paradoxical that the Board is supporting the substitution here, given the Regional Director's prior contract-bar determination.[9]

**6.** *See NLRB v. Newspapers, Inc.,* 515 F.2d 334, 337, 339 (5th Cir. 1975).

**7.** From the face of the contract, it appears that the employees' right to strike has not been impaired, for the grievance procedure is not made the exclusive form of redress for grievances.

**8.** *See NLRB v. Pearl Bookbinding Co., Inc.,* 517 F.2d 1108, 1111–12 (1st Cir. 1975); *Equipment Manufacturing, Inc.,* 174 NLRB 419, 420 n.6 (1969).

**9.** The Board's decision in *United Hydraulics Corp.,* 205 NLRB 62 (1973), by analogy supports our result. There, the Board refused to reach the *American Bridge* issue whether an independent could affiliate with the UAW by special meeting within one year from a Board election (where the UAW was beaten). The Board overturned an amendment of certification granted by the Regional Director. It found that a contrary holding "would, for all practical

The Board argues that this Circuit's decision in *NLRB v. Hershey Chocolate Corp.,* 297 F.2d 286 (3 Cir. 1961), is controlling, rather than *American Bridge.* We cannot agree. *Hershey Chocolate* is an affiliation case, where an international union was expelled from the AFL–CIO because of internal corruption. One of the expelled international's locals attempted to disaffiliate in order to join the new international that the AFL–CIO established in place of its expelled member. The expelled international obtained a finding by the Board that the local, as an affiliate of the new international, committed an unfair labor practice by attempting to enforce the contract the local had signed during its affiliation with the expelled international. This Circuit refused to enforce the Board's order, finding that the newly-affiliated local was a continuing entity, which had merely "changed its international hat." *Id.* at 287, 291.

*Hershey Chocolate* is distinguishable because the policy of preserving industrial stability under existing contracts was not threatened there, 297 F.2d at 290–291, as it was in *American Bridge,* 457 F.2d at 664. The company had no objection to the change in the local's affiliation from one international to another. Any change in the local's economic options or in its locus of power was not of importance, as evidenced by the company's position. Thus the stable bargaining relationship was not affected under the second point of the *American Bridge* test. For all intents and purposes, the company's position indicated there was no question of representation because the contractual party was the same.[10]

If the Board wishes to allow powerful international unions to be substituted for independent locals while contracts are in force, it can modify or abolish the contract-bar rule.[11] As applied by the Regional Director, the rule defines the appropriate time and manner for the palpable change of representation sought here. We do not believe it is our function to enforce such a result.[12]

Accordingly, we decline to enforce the Board's order.

---

purposes, be overturning the results of a recent . . . Board election proceeding in which the UAW . . . was rejected by a majority" of the employees. *Id.* Here the UAW attempts to overturn a Regional Director's ruling that no such election be held. That determination should have been appealed if incorrect, not subverted by an affiliation stratagem.

**10.** This conclusion is supported by the Court's finding that, from the employees' perspective, there was also no question of representation. There had been a Board-certified election, after a determination by the Board that there was a "schism" in representation under the general guidelines developed by the Board to handle a raft of such cases arising when the international was expelled. Normally a schism occurs in a representation context when the previously certified representative opposes amendment of certification. *See, e. g., North Electric Co.,* 165 NLRB 942 (1967). The Court found that application of the general guidelines to the facts of the case was inappropriate. This was part of a broader holding that, because there was no schism, there was no question of representa-

tion. 297 F.2d at 291. In our case, there has been no serious allegation of schism, so we have no need to reach this first point of the *American Bridge* test, *viz.,* no amendment if the certified union opposed it. We base our finding on the second point, *viz,* no amendment if the bargaining unit did not remain the same. Nonetheless, this analysis of the employee perspective supports a reading of *Hershey Chocolate* finding that the case presented no question of representation. *See Abrams v. Carrier Corp.,* 434 F.2d 1234, 1243–44 (2d Cir. 1970).

**11.** We do not think it is enough for the UAW local to flatly assert in a form letter to the Company that there had been no change in representation and therefore avoid, by implication, the Regional Director's previous contract-bar determination.

Given the Regional Director's determination, it is unnecessary for us to focus on the election procedures used to affiliate.

**12.** *Cf. Gulf Oil Corp.,* 109 NLRB 861 (1954).