

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-9-1998

# CPS Chem Co Inc v. NLRB

Precedential or Non-Precedential:

Docket 97-3595,97-3659

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"CPS Chem Co Inc v. NLRB" (1998). *1998 Decisions.* Paper 259.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/259

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 9, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 97-3595 and 97-3659

CPS CHEMICAL COMPANY, INC.
Petitioner in 97-3595

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent

OIL, CHEMICAL AND ATOMIC WORKERS
INTERNATIONAL UNION, AFL-CIO
Intervenor-Respondent

NATIONAL LABOR RELATIONS BOARD
Petitioner in No. 97-3659
OIL, CHEMICAL AND ATOMIC WORKERS
INTERNATIONAL UNION, AFL-CIO
Intervenor-Petitioner

v.

CPS CHEMICAL COMPANY, INC.
Respondent

On Petition for Review of Decision and Order of
National Labor Relations Board and Cross-Application
by NLRB for Enforcement of Its Order
Board No. 22-CA-20769

Argued: September 25, 1998

Before: BECKER, Chief Judge, WEIS and GARTH
Circuit Judges.

(Filed November 9, 1998)

WILLIAM K. HARVEY, ESQUIRE
 (ARGUED)
Jackson, Shields, Yeiser & Cantrell
262 German Oak Drive
Cordova, TN 38018

MARK EDWARD ROGART, ESQUIRE
General Counsel
CPS Chemical Company, Inc.
900 Route 9 North
Woodbridge, NJ 070-1015

Attorneys for CPS Chemical Co.

STEVEN B. GOLDSTEIN, ESQUIRE
 (ARGUED)
National Labor Relations Board
Contempt Litigation Branch
1099 14th Street, NW
Suite 10700
Washington, DC 20570

MARGARET A. GAINES, ESQUIRE
FREDERICK L. FEINSTEIN,
 ESQUIRE
LINDA SHER, ESQUIRE
AILEEN A. ARMSTRONG, ESQUIRE
National Labor Relations Board
1099 14th Street, NW
Washington, DC 20570-0001

Attorneys for National Labor
Relations Board

MARSHA S. BERZON, ESQUIRE
 (ARGUED)
Altshuler, Berzon, Nussbaum,
 Berzon & Rubin
177 Post Street, Suite 300
San Francisco, CA 94108

JONATHAN P. HIATT, ESQUIRE
JAMES B. COPPESS, ESQUIRE
AFL-CIO
815 16th Street, NW
Washington, DC 20006

KATHLEEN A. HOSTETLER,
 ESQUIRE
Oil, Chemical & Atomic Workers
 International Union
AFL-CIO
255 Union Blvd.
Lakewood, CO 80288-8200

Attorneys for Oil, Chemical and
Atomic Workers International Union,
AFL-CIO

OPINION OF THE COURT

BECKER, Chief Judge.

CPS Chemical Company, Inc. ("CPS") petitions for review of an order of the National Labor Relations Board ("NLRB" or "Board") finding that CPS violated section 8(a)(1) and (5) of the National Labor Relations Act ("NLRA" or "Act") by refusing to recognize and bargain with Local 8-397 of the Oil, Chemical and Atomic Workers International Union ("OCAW" or "International"). The Board has cross-petitioned for enforcement of its bargaining order. CPS does not contest that it failed to recognize and bargain with Local 8-397. Rather, it argues that it was not obligated to do so because the affiliation of the independent union at CPS's Old Bridge, New Jersey, plant with Local 8-397 "resulted in such discontinuity that OCAW could not legitimately claim to represent the employees without a NLRB election to resolve the question concerning representation." Pet'r Br. at 1.

CPS relies heavily on several cases decided by this Court in the 1970s, in which we refused to enforce Board orders similar to the one at issue here. See Sun Oil Co. v. NLRB, 576 F.2d 553 (3d Cir. 1978); NLRB v. Bernard Gloekler N.

3

E. Co., 540 F.2d 197 (3d Cir. 1976); American Bridge Div.,
U.S. Steel Corp. v. NLRB, 457 F.2d 660 (3d Cir. 1972). Our
reasoning in those cases, however, has been undermined in
significant respects by an intervening decision of the
Supreme Court. See NLRB v. Financial Inst. Employees,
Local 1182, 475 U.S. 192 (1986) [Sea-First]. Sea-First
created a new standard by which we must evaluate cases
such as the present one and prevents us from relying on at
least some of the factors we considered persuasive in our
earlier cases. More specifically, Sea-First requires the Board
(and us) to focus exclusively on employees and their
relationship to their union when evaluating whether a
"question of representation" exists. Any concern with the
effect of internal union changes on the union's relationship
with the employer, upon which we focused in our earlier
cases, are outside the purview of representation issues
under the Act. Further, to the extent that a portion of our
analysis in the earlier cases is still valid, wefind this case
easily distinguishable on its facts.

In this case, the Board applied its general principles
governing union recognition, as well as the specific
principles for union affiliations that require the employer to
demonstrate that an affiliation has created a substantial
change in a union and in the relationship between the
employees and their union. The Board found there to be no
substantial change. We find that the Board's factual
findings and its application of these affiliation principles
have substantial support in the record, and that its
conclusions are based on a reasonable interpretation of the
Act and the case law in this area. Consequently, we will
deny CPS's petition for review and will enforce the Board's
order.1

_____

1. CPS also sought review of the Board's refusal to enforce its subpoena
for certain union records. CPS did not formally request that the Board
enforce the subpoena, and virtually all of the records it requested were
provided before or at the hearing. Further, it has presented no evidence
of prejudice in the failure of the Board to enforce its subpoena. See
Kenrich Petrochemicals, Inc. v. NLRB, 893 F.2d 1468, 1484-85 (3d Cir.)
("Absent a showing of abuse of discretion or actual prejudice," a
challenge to a failure to produce documents prior to an NLRB hearing
will be rejected), vacated in part on other grounds, 907 F.2d 400 (3d Cir.
1990) (en banc).

4

I.

CPS operates a chemical plant in Old Bridge, New Jersey, at which it employs approximately 32 production employees (operators, mechanics, and laborers). From 1984 through 1995, these employees were represented by an independent union, which was not affiliated with any local, regional, or national organization. The independent union handled its own negotiations, electing a committee of workers to bargain with the employer, and processed its grievances without outside assistance. On the rare occasions when grievances were arbitrated, the union hired an attorney to handle those cases. In 1995, leaders of the independent union began exploring the possibility of affiliating with a larger union. At this time, the employer and union were parties to a three-year collective bargaining agreement, effective through January 3, 1996. In April 1995, about half of the CPS employees met with representatives of Local 8-397 of OCAW, a national union with approximately 85,000 members. Following discussions with OCAW, a special meeting was called by the independent union's leadership for CPS employees to vote on whether or not to affiliate with Local 8-397. Notice of the meeting was sent to all union members on May 1, 1995, and the meeting was held on May 17, 1995.

Fifteen employees attended the May 17 meeting and voted by secret ballot. Seven others mailed in absentee ballots. All twenty-two members of the independent union who voted cast their ballot in favor of affiliation. As a result of the vote, a resolution was adopted changing the name of the independent union and handing over all assets and property of the independent union to Local 8-397. The resolution also indicated that Local 8-397 would become a party to the collective bargaining agreement with CPS, and directed the leadership of the union to take all necessary steps to effect the change in affiliation.

CPS employees make up only a small portion of Local 8-397's membership; employees of approximately 18 different employers are affiliated with the Local, which has about 550 members. All Local 8-397 members employed by the same company make up a "unit group." Each unit group handles its own negotiations and grievances, but a

5

representative of OCAW usually assists in negotiations and arbitrations. The unit groups decide grievance settlements on their own and must approve any collective bargaining agreement to which they are a party. The International also must approve any contracts negotiated by the unit groups, but the International cannot force a unit group to accept a contract that the latter does not itself approve. Local 8-397 dues are equal to two hours pay per month, or about $30 for CPS employees, as compared to the independent union's dues of $12 per month. Unit groups elect a unit vice-president, who leads the unit and sits on Local 8-397's executive board, and grievance/negotiation committeemen.[2]

Following the affiliation vote, Local 8-397 wrote to CPS informing it of the affiliation. After requesting certain information and noting that it would withhold judgment on the affiliation, CPS notified Local 8-397 on June 7, 1995, that it would not recognize the affiliation and that it would refuse to recognize and bargain with Local 8-397 as the representative of its production employees. Local 8-397 therefore filed an unfair labor practice charge with the NLRB, which issued a complaint against CPS, alleging violations of section 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. S 158(a)(1), (5) (1994). Section 8(a)(5) provides that it is an unfair labor practice for an employer to refuse to bargain with the representative of its employees. Section 8(a)(1) makes it improper to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in section 7 of the Act, including the rights to organize and bargain collectively. Following a hearing, an Administrative Law Judge found that CPS had violated both section 8(a)(1) and (5). The Board affirmed the ALJ's findings and adopted his recommended order. See CPS Chemical Co., 324 N.L.R.B. No. 154, 1997 WL 703038 (Nov. 7, 1997). CPS petitioned this Court for review of the Board's order and the NLRB cross-petitioned for

_____

2. The CPS unit group has not held elections because CPS has refused to recognize and bargain with the new entity. It expects to do so once recognition is forthcoming. The president of the former independent union has maintained his leadership position pending elections, effectively acting as the new unit's vice president.

enforcement of the order. We have jurisdiction under section 10(e) and (f) of the Act, 29 U.S.C. S 160(e), (f).

While CPS challenges many of the Board's factual findings, "we must . . . accept the Board's factual determinations and reasonable inferences derived from factual determinations if they are supported by substantial evidence." Stardyne, Inc. v. NLRB, 41 F.3d 141, 151 (3d Cir. 1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (internal quotations omitted). As to the Board's legal analysis of the affiliation issue, our review is plenary, but "[b]ecause of the Board's `special competence' in the field of labor relations, its interpretation of the Act is accorded substantial deference." Pattern Makers' League v. NLRB, 473 U.S. 95, 100 (1985).

II.

A.

This case is governed by certain basic principles established by the Act and the cases construing it. It is well settled that a duly recognized union enjoys a rebuttable presumption that it has the support of a majority of bargaining unit employees after its first year of representation. See Furniture Rentors of Am., Inc. v. NLRB, 36 F.3d 1240, 1244 n.1 (3d Cir. 1994). An employer who doubts the validity of this presumption--i.e., an employer who believes that a "question of representation" exists-- may take one of three steps to clarify the union's continued majority support. See Allentown Mack Sales & Serv., Inc. v. NLRB, 118 S. Ct. 818, 820 (1998). It may (1) petition for a Board-supervised election, see 29 U.S.C.S 159(c)(1)(B); 29 C.F.R. S 101.17 (1998); (2) conduct an internal poll of its employees to gauge their support for the union, see Hajoca Corp. v. NLRB, 872 F.2d 1169, 1173 (3d Cir. 1989); or (3) withdraw recognition and refuse to bargain with the union, see Furniture Rentors, 36 F.3d at 1244 n.1. An employer who chooses either of the latter two paths must show that

7

it had a "good faith reasonable doubt" as to the union's continued majority support at the time it polled its employees or withdrew support; otherwise, it commits an unfair labor practice. See Allentown Mack, 118 S. Ct. at 820.

In this case, the employer followed the third course, unilaterally withdrawing recognition from the union. Therefore, it must demonstrate a "good faith reasonable doubt" as to the union's majority status to avoid the impact of our labor laws.3 Here, CPS attempts to do so by arguing that there was sufficient discontinuity between the pre-affiliation independent union and the post-affiliation entity to deny the latter the benefit of the majority support presumption. The Board has developed specific rules for evaluating claims that an affiliation excuses an employer's withdrawal of recognition from its union. If the principles on which the Board relies are sufficiently grounded in the Act and are not applied arbitrarily or capriciously, we must affirm the resulting decision reached by the Board. See Dorsey Trailers, Inc. v. NLRB, 134 F.3d 125, 129 (3d Cir. 1998) ("[T]his Court will enforce a board order that rests on a construction of the Act that is not an unreasonable or unprincipled construction of the statute." (internal quotations and brackets omitted)).

The relevant measuring rod in an affiliation case is contained in NLRA section 9(c), which provides that the Board can certify or decertify a union only after holding a

---------------------------------------------------------------

3. CPS asserts that the Board improperly placed on it the burden of proof in this case. This argument is without merit. There is no doubt that the Board has the burden of proving that an employer refused to bargain with its union. In this case, it is conceded that CPS has refused to bargain with Local 8-397. The disputed issue is whether this refusal was justified by a good faith reasonable doubt as to the union's majority status. It is appropriately the employer's burden to prove this defense to the established refusal to bargain. See Hajoca , 872 F.2d at 1174-75; see also Sioux City Foundry Co. v. NLRB, 154 F.3d 832, 840 (8th Cir. 1998) ("The employer has the burden of proving that the affiliation lacks substantial continuity."); cf. Allentown Mack, 118 S. Ct. at 820 (noting that withdrawal of recognition is an unfair labor practice "unless the employer can show that it had a `good faith reasonable doubt' about the union's majority support").

8

hearing and determining that "a question of representation exists," and then directing that an election be held. 29 U.S.C. S 159(c). Under section 9(c), any Board rule regarding union affiliations and withdrawal of recognition must be grounded in the basic "question of representation" formula:

> Under the Act, the certified union must be recognized as the exclusive bargaining representative of all employees in the bargaining unit, and the Board cannot discontinue that recognition without determining that the affiliation raises a question of representation and, if so, conducting an election to decide whether the certified union still is the choice of a majority of the unit.

Sea-First, 475 U.S. at 202; see also id. at 203 ("[W]here affiliation does not raise a question of representation, the statute gives the Board no authority to act.").

Sea-First is the Supreme Court's leading union-affiliation case. A unanimous Court held that a question of representation arises only if (1) "a new affiliation . . . substantially change[s] a certified union's relationship with the employees it represents" and (2) this change makes it "unclear whether a majority of employees continue to support the reorganized union." Id. at 202. Further, the Court noted that the evaluation of these issues must be undertaken with the policy of the NLRA in mind: industrial stability, which "would unnecessarily be disrupted if every union organizational adjustment were to result in displacement of the employer-bargaining representative relationship." Id. at 202-03 (internal quotations omitted). While CPS correctly notes that the Court in Sea-First did not pass on the Board's underlying affiliation jurisprudence, see id. at 200 n.7, the Court's holding that the Board's affiliation rule at issue there exceeded its authority was based on its reading of section 9(c) as focusing exclusively on whether the union continued to enjoy majority support from the bargaining unit. As long as the Board's affiliation jurisprudence remains grounded in this reading of section 9(c), it will be a reasonable interpretation of the Act.

9

B.

Both before and after Sea-First, the Board's standard for evaluating affiliation cases has been straightforward: an employer can rebut the presumption that a post-affiliation entity continues to enjoy majority support by proving that either (1) the affiliation vote did not meet minimal due process standards or (2) the affiliation substantially changed the nature of the pre-affiliation union. See, e.g., Western Commercial Transp., Inc., 288 N.L.R.B. 214, 217 (1988) ("The Board's traditional practice in such cases has been to examine whether an affiliation election was conducted with appropriate safeguards and whether there was a substantial change in the identity of the representative entity."). CPS does not argue that the vote lacked due process, so we need not address that issue here.

The Board has traditionally used a totality-of-circumstances analysis to determine whether there has been a substantial change in a union following affiliation. See, e.g., Sullivan Bros. Printers, Inc. v. NLRB, 99 F.3d 1217, 1223 (1st Cir. 1996). While the specific factors may differ in each case, we will typically defer to the Board's choice and evaluation of these factors as long as the focus remains on whether "a question of representation" exists and the Board's application of the factors is not arbitrary and capricious.

III.

CPS relies primarily on the above cited cases from the 1970s, see supra, in which we denied the Board's petition for enforcement. We decline to similarly deny the Board's petition here, however, as we hold that these cases are no longer entirely valid precedents in light of the Supreme Court's intervening decision in Sea-First. An existing panel decision may be undermined by a succeeding decision of the Supreme Court even if the Court does not directly address the issue raised in the prior case. See Sheet Metal Workers Int'l Ass'n, Local Union No. 19 v. United States Dep't of Veterans Affairs, 135 F.3d 891, 902 (3d Cir. 1998). Indeed, a number of courts have opined that our trilogy of cases stand on weak ground following Sea-First. See, e.g.,

10

May Dep't Stores Co. v. NLRB, 897 F.2d 221, 229 n.9 (7th Cir. 1990) ("[T]he trilogy of Third Circuit cases . . . are of questionable precedential value in light of Sea-First."); Seattle-First Nat'l Bank v. NLRB, 892 F.2d 792, 798 (9th Cir. 1990) ("[T]he Court's statements cast doubt on the continuing validity of the Third Circuit's jurisprudence in this area . . . ."). Moreover, to the extent these cases remain good law, we find them distinguishable on their facts from the present case.

The first of these cases was American Bridge Division, U.S. Steel Corp. v. NLRB, 457 F.2d 660 (3d Cir. 1972), which is wholly distinguishable on its facts.4 It was

_____

4. In American Bridge, we found that an affiliation created "a far different
organization because the people who conduct a substantial part of the unit's dealings with management are no longer the association's officers, and the power of the unit's members to control those agents has radically changed." Id. at 663. We focused on four factors: (1) the local union could no longer call a strike without the approval of an outsider (i.e., the international's president); (2) settlement of all grievances and
other disputes would be made by the international union; (3) dues payments would go to the international union; and (4) the international had the power to determine when a strike would occur and when a contract would be signed. See id. at 664. In other words, there was "a clear departure from the former status of an independent union, where local officers negotiated the contract, settled the terms, handled the grievances and decided when and when not to strike"--a departure which "may well raise serious discontent among the employees." Id. We also expressed concern regarding the closeness of the affiliation vote and the lack of a secret ballot. See id. at 666.

American Bridge is easily distinguishable from the present case. Here, the CPS employees retain the right to strike without approval from the Local or OCAW. While OCAW has the right to withhold strike funds, there is no indication that the pre-affiliation union had any strike funds available, so "there is no showing that the CPS employees' freedom to strike has been impaired in any material way as a result of the affiliation." CPS Chemical Co., 324 N.L.R.B. No. 154, 1997 WL 703038, at *7 (Nov. 7, 1997). Local CPS employees will serve on the bargaining committee for negotiations, although an OCAW representative may assist them. No contract can be imposed on the employees without their consent. Grievances will be handled by the local officers, while the CPS unit will be assisted at arbitrations by an OCAW representative as they had been by an outside attorney before the affiliation. Finally, while the

11

primarily in the latter two cases that we relied on factors no longer viable after Sea-First. These affiliation cases, like American Bridge, are distinguishable from the present one, but more importantly, they have been partially (and significantly) undermined by Sea-First. In those cases, we focused, at least in part, on the effect of the affiliation on the employer. The Supreme Court, however, made clear in Sea-First that the Board's focus (and ours) must be grounded in the language of section 9(c) of the Act, and therefore must be exclusively on how the affiliation affects the union and its members.

In NLRB v. Bernard Gloekler North East Co., 540 F.2d 197 (3d Cir. 1976), the international union with which the independent entity eventually affiliated challenged the status of the independent union (alleging that it was dominated by the employer and was not a legitimate union). When efforts to have an NLRB complaint issued or to hold a certification election failed, the international's representative entered affiliation discussions with the union it had previously attacked. See id. at 198, 201, 203 n.9. As in American Bridge, in Bernard Gloekler the local with which the previously independent union affiliated controlled access to arbitrations and the international had sole discretion whether or not to call a strike. See id. at 199-200.

In deciding Bernard Gloekler, we placed considerable emphasis on the effect of the affiliation on the employer, focusing on the fact that the affiliation created a union with greater resources for bargaining and for economic actions such as strikes: "[T]he Company would be dealing with a union with different economic options and with a different locus of power." Id. at 202. We distinguished an earlier affiliation case by noting that, in the prior case, "[t]he company had no objection to the change in the local's

_____

present case does share one factor with American Bridge (dues will eventually be higher following the affiliation and the dues will go directly
to the Local and the OCAW), "the greater financial commitment asked of OCAW members undoubtedly reflects to some extent the fact that a large international union can provide more extensive services than a small independent like the Association." Id. at *6.

12

affiliation from one international to another. . .. For all intents and purposes, the company's position indicated there was no question of representation because the contractual party was the same." Id. at 203.

In Sun Oil Co. v. NLRB, 576 F.2d 553 (3d Cir. 1978), we again emphasized factors that are either not present in this case or are not a proper part of the affiliation analysis after Sea-First. These included "control by the International over the procedure for calling a strike" and concern over the fact that "the Company is now required to bargain with an International Union . . . which can also flex considerably more bargaining muscle than the 30-person local Independent." Id. at 557. We then held that "the increase in bargaining power," along with the transfer of much control to the international, made the case indistinguishable from American Bridge and Bernard Gloekler. See id. Finally, we outlined our view of the proper affiliation analysis, including an examination of whether the affiliation changed the employees' "obligations to management." Id. at 558. However, following Sea-First, factors that focus on the effect of the affiliation on the employer are no longer valid. See, e.g., May Dep't Stores, 897 F.2d at 229 n.9 ("[T]he increased size, financial support and bargaining power that such mergers create are the very factors recognized by the Supreme Court in Sea-First as the ordinary, valid reasons for mergers.").

In Sea-First, the Court made clear that an affiliation is no different from other internal changes made by a union, and that it only justifies a change in the bargaining relationship if it raises a question of representation. See 475 U.S. at 205-07. In rejecting the Board's pre-Sea-First rule requiring that a union permit nonunion employees to vote on an affiliation, the Court noted:

> The Act assumes that stable bargaining relationships are best maintained by allowing an affiliated union to continue representing a bargaining unit unless the Board finds that the affiliation raises a question of representation. . . . The Board's rule effectively gives the employer the power to veto an independent union's decision to affiliate, thereby allowing the employer to

13

> directly interfere with union decisionmaking Congress
> intended to insulate from outside interference.

Id. at 209; cf. Auciello Iron Works, Inc. v. NLRB, 517 U.S. 781, 790 (1996) (expressing doubt that employees' representational interests could be protected by their employer).

The emphasis in Bernard Gloekler and Sun Oil on the effect of the affiliation on the employer clearly is not an appropriate focus following Sea-First, and we decline to consider this factor (and the Board properly declined as well) in this or future cases. We also conclude that the remaining factors from these earlier cases, such as the lack of local control over grievances, bargaining, and strikes, are readily distinguishable from those in the present case, in which the CPS employees retain authority over day-to-day matters such as grievances and negotiations. Finally, we note that our analyses in Bernard Gloekler and Sun Oil ignored the Board's longstanding presumption, implicitly endorsed by the Court in Sea-First, that an affiliation itself has no probative value regarding employees' continued support for the union. See Sea-First, 475 U.S. at 203 n.10. In our earlier cases, the smaller union's act of affiliating with a larger organization was itself seen as probative of a lack of continuity, justifying the employer's refusal to recognize the new entity. After Sea-First, this presumption of discontinuity from the fact of affiliation is no longer warranted.5

_____

5. Judge Garth notes that Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), specifying a standard of deference, was decided by the Supreme Court after this Court's trilogy of cases (Sun Oil Co. v. NLRB, 576 F.2d 553 (3d Cir. 1978); NLRB v. Bernard Gloekler N. E. Co., 540 F.2d 197 (3d Cir. 1976); American Bridge Div., U.S. Steel Corp. v. NLRB, 457 F.2d 660 (3d Cir. 1972)). Chevron dictates that a federal court "must defer to a reasonable construction of a statute by the administrative agency charged with administering the statute if Congress has not directly spoken to the precise question at issue." Reich v. D.M. Sabia Co., 90 F.3d 854, 859 (3d Cir. 1996). D.M. Sabia, among other things, held that a panel opinion, decided before Chevron, did not accord proper Chevron deference to an administrative agency (OSHA), and therefore did not bind a subsequent panel. See id. at 859-60. Judge Garth believes that the deferential standard of review we apply here is consistent with principles in Chevron because Congress has not spoken to the pre- and post-affiliation circumstances that would raise a question of representation sufficient to relieve an employer of its
statutory bargaining obligations.

IV.

Having addressed CPS's reliance on our prior cases for its challenge to the Board's order, we now address its objections to the Board's specific application of its affiliation principles in this case. The factors which the Board found dispositive here included the following: (1) the independent union's president continues to serve as the unit's leader following affiliation; (2) employees are eligible to join the new union without paying an initiation fee and without an immediate increase in dues (which will rise to OCAW's standard dues level over five years); (3) contracts will be negotiated by a committee made up of CPS employees; (4) the employees cannot have contract terms imposed on them against their will; and (5) the employees' freedom to strike has not been impaired. See CPS Chemical Co., 324 N.L.R.B. No. 154, 1997 WL 703038, at *4-*7 (Nov. 7, 1997). Moreover, although the independent union's assets were transferred to Local 8-397, "there is no showing that the CPS employees have fewer resources that can be committed to their representational needs" than before the affiliation. Id. at *8.

CPS challenges some of the factual findings underlying the Board's decision and also argues that there is a lack of continuity on the basis of additional factors not listed above. Although reasonable minds could differ on certain conclusions,6 there is clearly substantial support in the record for the Board's findings of fact. In some cases, the factual disputes revolve around the differences between the stated policy of OCAW and its actual practice, with CPS emphasizing the former and the Board focusing on the latter. However, the Board has consistently looked at actual practice and not at mere policy statements when undertaking affiliation analyses, see Sullivan Bros., 99 F.3d at 1226, and we find this choice to be a reasonable one. We have considered the additional factors cited by CPS, but find them either insufficient to offset the substantial evidence supporting the Board's finding of continuity or simply immaterial to a determination of whether a question

_____

6. For example, it is unclear whether OCAW has unequivocally promised to phase in the new dues level.

15

of representation exists, and not worthy of discussion. We thus find CPS's attack on the Board's affiliation analysis to be without merit and have no difficulty enforcing its bargaining order on the basis of its rational analysis of the relevant factors.

V.

CPS also claims that the Board's decision in this case is inconsistent with its own governing precedents, including the two leading affiliation cases after Sea-First. In both of those cases, a majority of the Board found that substantial changes had occurred following affiliation, excusing the employer's refusal to recognize the post-affiliation union. See Western Commercial Transp., Inc., 288 N.L.R.B. 214 (1988); Garlock Equip. Co., 288 N.L.R.B. 247 (1988). Given the necessarily fact-bound nature of the Board's totality-of-the-circumstances analysis, we find nothing troubling in the different results reached by the Board in these earlier cases and in the present one.

In both of these earlier cases, the key factors which the Board relied upon to find a lack of continuity were that (1) daily representation matters and regular contract administration were handled by full-time union staffpersons following affiliation whereas they were formerly handled by an elected employee-officer; (2) strikes could only be undertaken with the approval of international officers; and (3) in at least one of the cases, there was no indication that employees would continue to select any of their leaders. See Western Commercial, 288 N.L.R.B. at 216; Garlock, 288 N.L.R.B. at 248. As noted above, wefind substantial support in the record for the Board'sfinding that these factors are not present here. Daily representation matters, grievances, and contract negotiations will be handled by CPS employees, as they were prior to the affiliation. The only difference is that the affiliation has provided the employees with the option of seeking assistance from OCAW staffpersons when grievances are taken to arbitration or when contract negotiations are being conducted. The decision to strike can be made by CPS employees alone, without the approval of any Local 8-397 or OCAW officers. Finally, CPS employees will continue to

16

elect their ultimate leader, the unit vice-president, as well as committee members who will handle grievances and negotiations.

The Board's application of the totality-of-circumstances analysis here was fair and rational, and fully consistent with its prior affiliation jurisprudence, including the decisions in Western Commercial and Garlock. Application of the Board's affiliation principles will sometimes lead to a determination that substantial changes have taken place, warranting an employer's refusal to bargain. In other cases, the analysis will rationally lead to a conclusion that continuity exists, leaving a recalcitrant employer subject to the sanctions of the NLRA for its withdrawal of recognition. That the analysis leads to different results, and that the Board reached a different conclusion under its analysis in the present case than it did in Western Commercial and Garlock, is insufficient reason for us to look unfavorably on either the Board's affiliation principles or its application of these principles. We will not deny enforcement of the Board's order simply because it has reached a different conclusion here than it did in prior cases with somewhat similar--but ultimately distinguishable--facts.

Other courts have similarly found no problem with the varying results the Board has reached in applying affiliation facts to its principles. The Seventh Circuit granted the Board's petition for enforcement of a decision finding that continuity existed despite the international's post-affiliation right to review all bargaining proposals and final agreements of the previously independent union; the requirement that the international authorize any local strikes; and the fact that the local's dues were subject to minimums set by the international. See May Dep't Stores, 897 F.2d at 229; see also id. at 229-30 & n.10 (discussing the relevant affiliation factors and distinguishing Western Commercial and Garlock).

The First Circuit recently affirmed a Board finding of continuity following affiliation despite the fact that the post-affiliation entity had all new officers and the former entity's assets were transferred to the union with which it affiliated. See Sullivan Bros., 99 F.3d at 1224, 1229. Finally, earlier this year, the Eighth Circuit granted a Board petition for

17

enforcement of a decision finding continuity, relying on four primary factors: (1) "the employees retained the right to elect their own negotiating teams for collective bargaining"; (2) employees maintained "the right to decide whether to accept contract proposals"; (3) local officials would decide whether to take a grievance to arbitration, although international officials could assist in the process; and (4) no employees could be forced to pay dues or fees to the new entity, as the plant was in a "right-to-work" state. Sioux City Foundry Co. v. NLRB, 154 F.3d 832, 840 (8th Cir. 1998). All but the last factor are present in this case.

VI.

For the foregoing reasons, we will grant the Board's Petition for Enforcement of its decision and deny CPS's petition for review.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

18